In the

# United States Court of Appeals
### For the Seventh Circuit

No. 05-3722

NANCY SPIEGLA,

*Plaintiff-Appellee,*

*v.*

EDWARD HULL, Individually and
as an employee of Westville Correctional Facility,
HERBERT NEWKIRK, Individually and as
Superintendent of Westville Correctional Facility,
and BERNARD JOHNSON, Individually and as an
Employee of Westville Correctional Facility,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division at Lafayette.
No. 01 CV 0075—**Allen Sharp**, *Judge.*

ARGUED SEPTEMBER 12, 2006—DECIDED MARCH 30, 2007

Before EASTERBROOK, *Chief Judge*, and POSNER and
SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* This First Amendment retalia-
tion case is before us for the second time. In the first
appeal, we held that Indiana State Correctional Officer
Nancy Spiegla engaged in protected speech by reporting
a possible security lapse to an assistant superintendent
at the Westville Correctional Facility where she worked.

On remand, a jury found that the defendants—Westville's superintendent, assistant superintendent, and a senior corrections officer—retaliated against her on the basis of this protected speech and awarded her $210,000 in damages. The defendants appealed, and after briefing was completed, the Supreme Court decided *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1960 (2006), holding that the First Amendment does not protect statements made pursuant to a public employee's official duties because that employee is not speaking as a "citizen" but as an employee. Because our first holding addressed the degree of First Amendment protection afforded public employees under then-existing case law, we must now reexamine its soundness in light of *Garcetti*.

The speech at issue here is a complaint Spiegla made about having been prevented by her immediate supervisor from investigating a possible security breach while she was on duty and stationed at the prison's main gate. Spiegla noted the incident in her log and later that same day reported it to an assistant superintendent. In bringing the possible security lapse to his attention, Spiegla was speaking not as a citizen but as a correctional officer charged with the duty to ensure the prison's safety and security. Accordingly, the First Amendment does not insulate her statements from employer discipline, and the judgment in her favor must be vacated.

## I. Background

From 1985 to 2000, Nancy Spiegla was employed as a state correctional officer at the Westville Correctional Facility in Indiana. From 1993 to 2000, Spiegla worked essentially the same post at the prison's main gate on a 5-2 schedule (five days on, two off). Working the main gate involved controlling the traffic in and out of the prison, as well as searching the vehicles of visitors and employees for

contraband. By all accounts Spiegla was an outstanding employee throughout her tenure at the prison.

On January 13, 2000, Spiegla was at her main-gate post alongside Sergeant Brian Moody, her immediate supervisor, when something in the parking lot caught her attention. She saw Major Eddie Hull and Captain Ernest Huff transfer bags from their private vehicles into the state-owned truck they were driving. When the two men approached the main gate in the truck, Spiegla intended to search their bags for possible contraband as part of the general search she performed on all vehicles entering the prison.[1] But when she got up to leave the guard house, Moody dissuaded her from searching the truck, explaining that a recent change in prison policy exempted all state vehicles from search. Spiegla had not heard of any change and believed the correct policy was to search all vehicles, no exceptions. Frustrated that she "could not go out there and do [her] job," Spiegla noted the apparent breach of prison policy in her log.

Later that day, Spiegla recounted the incident to Assistant Superintendent John Schrader, who told her she should have searched Hull and Huff's truck. Schrader also promised to refer the matter to Superintendent Herbert Newkirk, which he did at an executive staff meeting later that day or the next. At the meeting Newkirk asked Assistant Superintendent Bernard Johnson (who was angry at the manner in which Spiegla's concerns were raised) to investigate the matter.

Four days later Spiegla was reassigned from the main gate to the perimeter, a 6-2 shift that involved walking around the prison's outer fence and delivering food to the

---

[1] There is no indication Hull or Huff were actually engaged in smuggling contraband.

towers. Upset over the transfer, Spiegla brought this action under 42 U.S.C. § 1983 against Johnson, Hull, and Newkirk, all of whom had authority to transfer her. She claimed she was transferred in retaliation for reporting the main gate incident to Schrader; these statements, she asserted, were protected speech under the First Amendment. The district court granted summary judgment for the defendants on the ground that Spiegla "was not speaking out as a citizen, but rather as an employee" and therefore had not engaged in protected speech.

On appeal we reversed and remanded, holding in part that the First Amendment did protect her statements to Schrader. *Spiegla v. Hull*, 371 F.3d 928, 939 (7th Cir. 2004) ("*Spiegla I*") (concluding that Spiegla "spoke as a private citizen on a matter of public concern"). The case ultimately went to trial on the remaining issues of fact—namely, causation and whether the defendants would have taken the same action in the absence of the protected speech. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977). The jury found for Spiegla and awarded her $210,000 in damages.

The defendants appealed, asserting a number of trial errors. But after briefing was completed, the Supreme Court issued its decision in *Garcetti*, clarifying the threshold legal inquiry in First Amendment retaliation claims in the public employment context. The defendants requested a supplemental briefing schedule in light of *Garcetti*. We granted their request and ordered the parties to submit supplemental memoranda discussing the effect of *Garcetti* on this appeal.

## II. Analysis

Our first inquiry is the application of *Garcetti* to Spiegla's claim; if Spiegla was not speaking as a "citizen"

as understood in *Garcetti*, her speech was not protected by the First Amendment as a matter of law and we need not reach the trial errors asserted by the defendants. *Garcetti* made it clear that public employees have no cause of action for First Amendment retaliation unless they were disciplined for speaking *as citizens* about a matter of public concern. 126 S. Ct. at 1958, 1960. When public employees make statements pursuant to their official duties, they are not speaking as citizens and "the Constitution does not insulate their communications from employer discipline." *Id.* at 1960. In other words, if Spiegla's statements to Schrader were made pursuant to her official duties as a correctional officer, it was not protected speech and she has no claim for First Amendment retaliation.

## A. Procedural Arguments

Before turning to the impact of *Garcetti* on Spiegla's claim, we must first address her contention that the defendants' "efforts to use [*Garcetti*] to overturn the . . . verdicts" are procedurally defective. More specifically, Spiegla asserts (1) the defendants waived their *Garcetti* argument by failing to raise it in the district court or in their initial appellate briefs; and (2) the defendants' "motion to discuss supplemental authority [was] an improper method" of raising *Garcetti*. She is wrong on both counts.

Arguments not raised in the district court are generally waived on appeal, *Belom v. Nat'l Future Ass'n*, 284 F.3d 795, 799 (7th Cir. 2002), but here the defendants did make a *Garcetti*-type argument before the district court. Most significantly, they moved for summary judgment on the basis that "speech required in the course of public employment is not protected by the First Amendment." This argument anticipated the ultimate holding in *Garcetti*,

and moving for summary judgment on this ground was sufficient to preserve the issue for appellate review. *See Pond v. Michelin N. Am., Inc.*, 183 F.3d 592, 597 (7th Cir. 1999).

The defendants' failure to raise a *Garcetti*-type argument on remand or in their initial appellate briefs in this second round of appellate proceedings was understandable. We had specifically rejected this line of argument in *Spiegla I*, holding that Spiegla "spoke as a private citizen on a matter of public concern when she brought the search policy and Hull and Huff's conduct to the attention of her superior." *Spiegla I*, 371 F.3d at 939-40. Accordingly, the law of the case doctrine barred the defendants from raising the issue again on remand or in their appeal from the judgment entered on the jury's verdict. *See EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 796 (7th Cir. 2005). When the defendants filed their opening and reply briefs in this second appeal, they had no basis to challenge anew our holding in *Spiegla I*. Only the Supreme Court's decision in *Garcetti* a few weeks later called *Spiegla I* into question and opened the door for a reexamination of that decision in this appeal. *Key v. Sullivan*, 925 F.2d 1056, 1060 (7th Cir. 1991) (stating that "a decision of the Supreme Court after the first review" triggers an exception to law of the case). Waiver under Rule 28(a)(5) of the Federal Rules of Appellate Procedure occurs when a party omits an available argument. *United States v. Feinberg*, 89 F.3d 333, 340-41 (7th Cir. 1996). A party cannot, however, waive an argument that did not exist when he submitted his brief. *Id.*; *see United States v. Henningsen*, 387 F.3d 585, 591 (7th Cir. 2004).

Spiegla also argues that the defendants picked the wrong procedural vehicle in which to raise *Garcetti*. She claims that rather than file a "motion to discuss supple-

mental authority," the defendants should have brought *Garcetti* to our attention by filing a letter pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure. The first flaw in Spiegla's argument is that a "motion to discuss supplemental authority" does not accurately characterize the defendants' post-*Garcetti* motion. Their motion simply requested a supplemental briefing schedule in light of *Garcetti*.

Second, the defendants were right to respond to *Garcetti* by requesting additional briefing rather than submitting a Rule 28(j) letter. Rule 28(j) permits parties to briefly apprise the court of new or previously undiscovered authority pertinent to arguments made orally or in the briefs. FED. R. APP. P. 28(j) ("The letter must state the reasons for the supplemental citations, referring either to the page of the brief or to a point argued orally."). It does not, however, provide a second forum in which to raise wholly new or different arguments. *See United States v. Jones*, 308 F.3d 425, 427 n.1 (4th Cir. 2002). Rule 28(j) letters are limited to 350 words. Because *Garcetti* armed the defendants with a new argument against the soundness of *Spiegla I* based on new controlling authority, they properly requested additional briefing rather than submit a Rule 28(j) letter. The issue of whether *Garcetti* requires us to revisit *Spiegla I* is ill-suited for a 350-word Rule 28(j) letter.

## B.  The Effect of *Garcetti*

We held in *Spiegla I* that Spiegla's speech was protected, but because the judgment in this case is not yet final, we are obliged to reevaluate that holding in light of *Garcetti*. *See Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 97 (1993) ("When this Court applies a rule of federal law to the parties before it, that rule . . . must be given full retroactive effect in all cases still open on direct review . . . .").

More specifically, we must reexamine whether Spiegla's statements to the assistant superintendent qualify for First Amendment protection under the standard articulated in *Garcetti*. The "inquiry into the protected status of speech is one of law, not fact." *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983).

Whether public-employee speech is protected is determined by reference to the two-part *Connick-Pickering* test. *Spiegla I*, 371 F.3d at 935. First, we inquire whether the employee "spoke as a citizen on a matter of public concern." *Id.* (citing *Connick*, 461 U.S. at 138). If not, the employee has no cause of action for First Amendment retaliation and there is no need to reach the second part of the test, which requires a balancing of the employee's interest "as a citizen in commenting on the matter" against the public employer's interest "as [an] employer[ ] in promoting effective and efficient public service." *Id.* at 940 (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)); *see Garcetti*, 126 S. Ct. at 1960. Prior to *Garcetti*, we considered the "content, form, and context" of the employee's speech to determine whether the employee spoke as a citizen on a matter of public concern, with content being the most important factor. *Spiegla I*, 371 F.3d at 935 (quoting *Connick*, 461 U.S. at 147-48); *Gustafson v. Jones*, 290 F.3d 895, 907 (7th Cir. 2002).

After *Garcetti*, however, the threshold inquiry is whether the employee was speaking as a citizen; only then do we inquire into the content of the speech. *Mills v. City of Evansville*, 452 F.3d 646, 647-48 (7th Cir. 2006). *Garcetti* made clear that public employees speaking "pursuant to their official duties" are speaking as employees, not citizens, and thus are not protected by the First Amendment regardless of the content of their speech. *See Garcetti*, 126 S. Ct. at 1959-60. Consequently, the operative question now is whether Spiegla made her statements

to Assistant Superintendent Schrader pursuant to her official duties as a correctional officer.

Based on the record as a whole, we conclude that Spiegla was speaking pursuant to her official duties—not as a citizen—when she told Schrader about the conduct of Hull and Huff, and about Moody's action in preventing her from conducting a search. As a correctional officer assigned to the main gate, Spiegla's primary responsibility was to regulate and monitor the vehicle and foot traffic through the gate. This involved searching incoming vehicles and people for contraband, tasks for which she received specialized training. Written prison "post orders" dictated who and what were subject to search, and Spiegla's employment required her to faithfully follow those orders. As a correctional officer, she also had a more general responsibility to keep the facility secure and report any suspicious behavior by prison inmates, staff, or visitors to her superiors.

Spiegla became suspicious when she saw Hull and Huff transfer bags to their state truck from their private cars. As they approached the gate, she got up to discharge her official duty—search the truck (as she did all vehicles) and "make sure there was nothing in those bags." When her immediate supervisor, Sergeant Moody, told her not to search the truck, she disagreed based on her understanding that "regardless of who you are, you are to be searched." Upset that she "could not go out there and do [her] job," Spiegla noted the incident in her log.

Later that day while still in uniform and on duty at the main gate, Spiegla saw Assistant Superintendent Schrader and explained to him that Moody stopped her from searching the truck of two "higher ups" she believed should have been searched. Spiegla recounted the incident to Schrader pursuant to her responsibility as a correctional officer to inform her superiors of a possible

breach in prison search policy, especially one involving two senior prison officers. In doing so she spoke as an employee, not a citizen, because ensuring compliance with prison security policy was part of what she was employed to do. *See Garcetti*, 126 S. Ct. at 1960.

We acknowledged in *Spiegla I* that Spiegla's statements were "consistent with her general duty as a correctional officer to keep the facility secure." 371 F.3d at 939. We went on to conclude, however, that because they "were not part and parcel of her core function[ ]" to implement but not question prison security policies, "she acted beyond her employment capacity and spoke as a private citizen on a matter of public concern." *Id.* This focus on "core" job functions is too narrow after *Garcetti*, which asked only whether an "employee's expressions [were] made pursuant to official responsibilities." *Garcetti*, 126 S. Ct. at 1961. Because Spiegla reported the possible security breach to Schrader as part of her official responsibility as a correctional officer to keep the prison secure, her speech was not "citizen" speech protected by the First Amendment. This holding is consistent with the early post-*Garcetti* precedent in this and other circuits. *Compare Mills*, 452 F.3d at 647-48 (police sergeant critical of her boss's personnel decision spoke as employee, not citizen), *Hill v. Borough of Kutztown*, 455 F.3d 225, 242 (3d. Cir. 2006) (borough manager who relayed worker complaints to borough council spoke as part of his duties as manager, not a citizen), *and Freitag v. Ayers*, 463 F.3d 838, 855 (9th Cir. 2006) (correctional officer did not speak as a citizen when she made internal reports to superiors about inmate sexual misconduct), with *Fuerst v. Clarke*, 454 F.3d 770, 774 (7th Cir. 2006) (deputy sheriff spoke as citizen because he made a public statement in his capacity as a union representative), *and Freitag*, 463 F.3d at 854 (correctional officer spoke as a citizen by sending

letters to a state legislator and the state inspector general).

That Spiegla's statements highlighted potential misconduct by prison officers does not change the fact that she was speaking pursuant to her official responsibilities, not as a citizen "contributi[ng] to the civic discourse." *Garcetti*, 126 S. Ct. at 1960. The memo at issue in *Garcetti* also pointed to serious official misconduct—possible misrepresentations made by a deputy sheriff in a warrant affidavit. But the assistant district attorney who wrote it was responsible for supervising warrant applications; because this was one of "the tasks he was paid to perform," he "acted as a government employee" when he wrote the memo and his speech was not protected. *Id.*

Similarly here, Spiegla "acted as a government employee" when she reported the possible misconduct to her superior and sought clarification of a security policy she felt may have been breached. She did not make a public statement, discuss politics with a coworker, write a letter to newspapers or legislators, or otherwise speak as a citizen. *See id.* at 1960, 1961 (listing examples of prototypical protected speech by public employees). Because Spiegla did not speak as a citizen under the standard articulated in *Garcetti*, she has no claim for First Amendment retaliation under § 1983.

Accordingly, the judgment entered in Spiegla's favor must be vacated, but not without our observation that the record and the jury's verdict substantiate that Spiegla was punished for simply trying to follow the rules. *Garcetti* instructed that public employers should, "'as a matter of good judgment,' be 'receptive to constructive criticism offered by their employees.'" *Garcetti*, 126 S. Ct. at 1962 (quoting *Connick*, 461 U.S. at 149). Our holding here, however, is a straightforward application of the principle in *Garcetti* that there is not a "constitutional cause of

action behind every statement a public employee makes in the course of doing his or her job." *Id.* The judgment is VACATED and the case is REMANDED to the district court with instructions to enter judgment for the defendants.

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*