In the

# United States Court of Appeals
## For the Seventh Circuit

No. 07-1792

RONALD VOSE,

*Plaintiff-Appellee,*

*v.*

DONALD KLIMENT, Chief of Police of
the City of Springfield, in his individual
capacity, and WILLIAM ROUSE, Deputy
Chief of Police of the City of
Springfield, in his individual capacity,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 06 C 3022—**Jeanne E. Scott**, *Judge.*

ARGUED SEPTEMBER 27, 2007—DECIDED OCTOBER 26, 2007

Before BAUER, RIPPLE, and KANNE, *Circuit Judges.*

BAUER, *Circuit Judge.* Defendants-Appellants Donald
Kliment and William Rouse appeal from the district
court's denial of their Motion to Dismiss on the basis of
qualified immunity. They assert that they are entitled to
qualified immunity against Plaintiff-Appellee Ronald
Vose's § 1983 claims which allege violations of Vose's
First Amendment free speech rights. Vose argues that
his speech was protected, and therefore Kliment and

Rouse's retaliation in response to that speech violated his constitutional rights. The district court determined that Vose's speaking out about fellow police officer misconduct was not part of his job duties, and thus was protected speech that was clearly established before the events of this case. Based on this, the district court held that Kliment and Rouse were not entitled to qualified immunity. We disagree with the district court's conclusion that Vose's speech was constitutionally protected, and therefore reverse its denial of qualified immunity to Kliment and Rouse.

## I. Background

In 2004, Vose was a police sergeant in the narcotics unit of the City of Springfield Police Department and had been with the Department for more than 26 years, including over 13 years in the narcotics unit. At that time, Donald Kliment was the Chief of Police of the City of Springfield, and William Rouse was the Deputy Chief of Police in charge of the investigations unit. As a sergeant in the narcotics unit, Vose supervised the narcotics unit and reported directly to Lieutenant David Dodson, who in turn reported to Rouse.

While working in the narcotics unit, Vose learned that detectives in the major case unit were using alleged drug investigations as a means to gather evidence by searching garbage from specific residences or locations in order to have a lawful basis to obtain search warrants for those locations. This search technique is called a "trash rip." Vose was worried that the trash rips could compromise ongoing drug investigations being conducted by his unit, and he was also concerned with the lack of coordination between the narcotics unit and the major case unit. Vose reviewed various applications for search warrants made by the major case unit and discovered that the major

case unit detectives were not following City of Springfield Police Department procedures for obtaining search warrants, that the detectives were violating laws applicable to the search warrant process, and that the detectives filed false or misleading affidavits with the courts in support of the search warrants. Vose also learned that search warrants were being obtained by major case unit detectives by claiming that the warrants were for the purposes of obtaining information on drug investigations; in fact, no such drug investigations were undertaken by the narcotics unit. Vose brought these concerns to the attention of his supervisors, including Rouse and Kliment during the summer or early fall of 2004. Vose also voiced his concerns about the detectives' apparent misconduct at Department meetings during the fall of 2004. To Vose's knowledge, neither Kliment nor Rouse had taken any action on his complaints.

On November 16, 2004, Vose told Rouse that some of the detectives from the major case unit were scheduled to testify at a criminal trial and that there may be a problem with their testimony. Rouse told Vose to attend the trial and report back to him. At the trial, Vose learned that documents possessed by the Springfield Police Department had not been turned over to the defense, as required by law. One of the detectives at the trial confronted Vose and accused him of working for the defendant. Vose reported back to Rouse what he had learned and the accusation made by the major case unit detective. Approximately two weeks later, Vose was served with an internal affairs complaint related to the incident at the trial. In December 2004, Rouse sent Vose a letter ordering him to report in writing about the alleged misconduct of the major case unit detectives, which Vose received immediately before he was scheduled for an approved vacation leave. Vose advised Rouse and Kliment that he would respond upon his return on January 3, 2005.

On February 14, 2005, Vose told Rouse that due to the sensitive nature of his written report on the detectives' alleged misconduct, which included criticism of Rouse's inaction, he would deliver the written report directly to Kliment. Vose delivered the report on March 2, 2005. Around that time, two newspaper articles were published regarding the alleged misconduct and perjury by the major case unit detectives.

Between the summer of 2004 and March 2, 2005, Rouse began interfering with the operations of the narcotics unit by revising work schedules and assigning another sergeant to the narcotics unit, which resulted in action taken by the narcotics unit without the supervision of Vose.

On April 12, 2005, Vose met with Kliment, Rouse, and two other police officers. Kliment told Vose to either "get along" with the detectives and supervisors about whom Vose had voiced concern or to request a transfer out of the narcotics unit to the patrol division. Vose was apparently instructed to make that decision and to report it to Kliment on Friday, April 15, 2005.[1] Worried that Kliment and Rouse were going to cover up his complaints about the misconduct, Vose met with the Mayor of the City of Springfield on April 14, 2005 to discuss his concerns.

At 4:50 pm on April 15, 2005, Vose delivered a memorandum to Kliment with his decision to transfer out of the narcotics division, noting that he considered the transfer

---

[1] The complaint is unclear as to exactly what Vose was required to present to Kliment on Friday, April 15, 2005. Based on Vose's presentation of a memorandum with his decision on Kliment's ultimatum, we reasonably infer that he was instructed to document his decision in writing to Kliment on that date.

to be involuntary. Four days later, Rouse issued a written reprimand to Vose for delivering his memorandum to Kliment later than ordered. Rouse ordered Vose to sign the reprimand, and on April 25, 2005, Vose sent another memorandum to Kliment contesting the reprimand. Pursuant to Kliment's directive, Rouse advised Vose that he would be transferred from the narcotics unit to the patrol division effective May 1, 2005. On May 14, 2005, Vose was issued a written reprimand arising out of the incident at the trial in November 2004.[2]

Three days after Vose delivered his decision to involuntarily transfer to the patrol division to Kliment, Vose found two empty boxes with his name on them outside his office, insinuating that Vose was to be "sent packing." After Vose transferred to the patrol division, a command officer advised other Springfield police officers that Vose's "career in [the criminal investigation division] is history" and that Vose had "burned his bridges." Vose felt forced to resign from the Springfield Police Department, and did so on January 19, 2006.

On February 1, 2006, Vose filed a complaint in the district court alleging violations of his constitutional rights. Specifically, Vose alleged that his First Amendment rights were violated when Kliment and Rouse retaliated against him for voicing his concerns about the conduct of the major case unit detectives. Vose claimed that Kliment and Rouse retaliated against him through the written reprimands, the interference with his role as supervisor of the narcotics unit operations, and the demotion to the patrol division. Kliment and Rouse moved to dismiss the case, asserting that they were entitled to

---

[2] Vose was subjected to an internal affairs interrogation on February 23, 2005 regarding the November 2004 confrontation with the detective at trial.

qualified immunity against Vose's claims because the applicable law on the rights of government employees to speak out was not clearly established at the time of the events. Kliment and Rouse hinged this argument on the fact that the United States Supreme Court clarified and narrowed the applicable law in *Garcetti v. Ceballos*, ___ U.S. ___, 126 S.Ct. 1951 (2006), which was decided after the alleged violation in this case. On March 8, 2007, the district court denied their motion, finding that Vose's right to speak out on matters relating to police misconduct without being subjected to retaliatory employment actions was clearly established before the events of this case, and that *Garcetti* did not affect nor create this right. Therefore, the district court held that Kliment and Rouse were not entitled to qualified immunity against Vose's claims. Kliment and Rouse now appeal that determination, and additionally argue that Vose did not have a constitutionally protected right to speak.

## II. Discussion

On appeal, Kliment and Rouse present two arguments in support of their position that they are entitled to qualified immunity. First, they assert that Vose's speech was not constitutionally protected. Secondly, they claim that the rights Vose alleges were violated were not clearly established at the time of the relevant events.

To determine whether an official is entitled to qualified immunity, we look to two issues. First, taken in the light most favorable to the plaintiff, the facts must show the official violated a constitutional right. *Finsel v. Cruppenink*, 326 F.3d 903, 906 (7th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001)). Second, we look to see if the right was clearly established at the time of the alleged violation. *Finsel*, 326 F.3d at 906 (citing *Doyle v. Camelot Care Centers, Inc.*, 305 F.3d 603, 616 (7th Cir. 2002)).

We review the district court's ruling on a motion to dismiss *de novo*. *Sigsworth v. City of Aurora*, 487 F.3d 506, 508 (7th Cir. 2007); *Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 471 (7th Cir. 2007). We accept all well-pleaded factual allegations in the complaint as true and construe all reasonable factual inferences in favor of the plaintiff. *Sigsworth*, 487 F.3d at 508.

We begin our inquiry with whether Kliment and Rouse violated Vose's constitutional right to free speech. Kliment and Rouse argue that Vose's speech was not constitutionally protected because Vose was speaking pursuant to his official duties as the supervisor of the narcotics unit, and not as a citizen. Vose argues that he spoke as a citizen in reporting the alleged misconduct to Kliment and Rouse, because he discovered the alleged misconduct in an independent investigation that was not part of his duties, and that the detectives were not under his supervision and were in a separate police unit.

The First Amendment protects a public employee's right to speak as a citizen addressing matters of public concern under certain circumstances. *Garcetti v. Ceballos*, ___ U.S. at __, 126 S.Ct. at 1957 (2006); *see, e.g.*, *Connick v. Myers*, 461 U.S. 138, 147-48 (1983); *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, ___ U.S. at ___-, 126 S.Ct. at 1960. Determining the official duties of a public employee requires a practical inquiry into what duties the employee is expected to perform, and is not limited to the formal job description. *See id*. at 1962-63 (explaining that formal job descriptions rarely resemble the actual duties of an employee for First Amendment purposes).

We focus our analysis exclusively on the initial oral statements made by Vose to Kliment and Rouse because all other speech regarded the same alleged misconduct and most of it was pursuant to direct orders of Rouse and Kliment. While Vose alleged that newspaper articles were published on the alleged misconduct, he did not allege in his complaint that he spoke to the newspapers. Instead, it appears that Vose included this information to bolster his position that the alleged misconduct is a matter of public concern. We accept that police misconduct is a matter of public concern, but as this analysis illustrates, that is no longer the initial inquiry on First Amendment retaliation claims. *See Garcetti*, ___ U.S. at ___, 126 S.Ct. at 1958 ("The first [inquiry] requires determining whether the employee spoke *as a citizen* on a matter of public concern.") (emphasis added).

Furthermore, we acknowledge that Vose has pleaded that he had a discussion with the Mayor of Springfield and that he believes Kliment was aware of this discussion. However, taking the facts in the light most favorable to Vose, we cannot find that Vose's discussion with the Mayor on April 14, 2005 was a motivating factor for the retaliation.[3] *See Mt. Healthy City Sch. Dist. Bd. Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (employee must show that his conduct was constitutionally protected and was a "substantial" or "motivating" factor in the retaliation); *see also Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) ("To make out a prima facie case of first amendment retaliation, a public employee must present evidence that: (1) his speech was constitutionally protected, (2) he has suffered a deprivation likely to deter free speech, and (3) his speech was at least a motivating factor in the employer's action."). Vose contends that the

---

[3]  Nor does Vose assert this argument.

retaliation took four forms: (1) the interference with Vose's control over operations of the narcotics unit; (2) the written reprimand for late submission of Vose's response to the ultimatum to transfer or "get along"; (3) the demotion to the patrol division; and (4) the written reprimand regarding the trial incident. While the meeting with the Mayor took place on April 14, 2005, the alleged retaliatory act of interference began sometime between the summer of 2004 and March of 2005.

Likewise, the ultimatum to "get along" or transfer to the patrol division was given on April 12, 2004. The written reprimand for the trial incident was issued after the meeting with the Mayor, but an internal affairs complaint regarding this incident was filed on November 30, 2004. As such, it would simply appear to be a natural sequence of events: that the written reprimand followed the complaint filing and the interrogation process described by Vose's complaint.

Lastly, although Vose received a written reprimand for allegedly turning in a late memorandum, he had already requested (albeit forced) the transfer to the patrol division, and Vose contested the reprimand. Vose does not allege any further retaliatory action taken based on an alleged tardiness of his memorandum or his decision to contest the written reprimand. *See Massey*, 457 F.3d at 716 (employee must suffer a deprivation). Therefore, we cannot reasonably infer that the alleged retaliation was motivated by Vose's meeting with the Mayor.

Vose's initial statements regarding the alleged misconduct of the detectives in the major case unit were pursuant to his official duties as supervisor of the narcotics unit. Vose's complaint states that Vose learned of the major case unit detectives' trash rips when he was working in the narcotics unit, and that based on learning of the trash rips, he reviewed various applications for search warrants made

by the major case unit detectives because he was concerned about "the possibility of these trash rips [compromising] ongoing investigations being conducted by his unit" and "the lack of coordination between the activities of the major case unit and the narcotics unit."

While Vose contends that his official duties as supervisor of the narcotics unit did not include responsibility for investigating potential misconduct of officers in another unit, this argument fails to consider his own admitted interests in the investigation: that the alleged misconduct could directly affect his narcotics unit. As a supervisor of the narcotics unit, it can hardly be said that Vose did not have a duty to make sure his unit's investigations were not compromised by some outside influence, or that Vose did not have a duty to coordinate his unit's work with other related units in the police department. Vose may have gone above and beyond his routine duties by investigating and reporting suspected misconduct in another police unit, but that does not mean that he spoke as a citizen and not as a public employee. "Th[e] focus on 'core' job functions is too narrow after *Garcetti*, which asked only whether an 'employee's expressions [were] made pursuant to official responsibilities.'" *Spiegla v. Hull*, 481 F.3d 961, 966 (7th Cir. 2007) (quoting *Garcetti*, ___ U.S. at ___, 126 S.Ct. at 1961). Because Vose was responsible for the operations of the narcotics unit, his speech regarding alleged misconduct that may affect his unit was made pursuant to his official responsibilities, and not as a private citizen, despite not having explicit responsibility for the detectives involved or the search warrants at issue.

Vose seeks to distinguish three post-*Garcetti* Seventh Circuit cases in arguing that he spoke as a citizen, and not as a public employee. First, in *Mills v. City of Evansville*, 452 F.3d 646 (7th Cir. 2006), an on-duty sergeant criticized her superior's plan to reduce the number of officers under

her supervision. The *Mills* Court held that the sergeant's criticism was not the speech of a citizen because her speech was her "contributi[on] to the formation and execution of official policy." 452 F.3d at 648.

Vose asserts that his speech, unlike the sergeant's speech in *Mills*, was not a criticism of official policy, but instead was speech designed to expose the wrongdoings of officers beyond his control, and therefore Vose spoke as a citizen, not a public employee. Vose misses the point. It is not the negative or policy-oriented content of the speech that is the focus of the inquiry post-*Garcetti*; it is whether the speech was pursuant to his official duties or whether the expression was that of a private citizen. *Garcetti*, ___ U.S. at ___, 126 S.Ct. at 1959-60.

Next, Vose argues that his case is distinguishable from *Spiegla v. Hull*, 481 F.3d 961 (7th Cir. 2007). In *Spiegla*, a corrections officer responsible for maintaining prison security reported a breach of a prison security policy by another prison employee to her superior. 481 F.3d at 962-63. The *Spiegla* Court held that the corrections officer was speaking pursuant to her official duties—not as a citizen—when she reported the security policy breach because ensuring compliance with prison security policy was part of what she was employed to do. *Id.* at 965-66.

Vose asserts that *Spiegla* differs because the corrections officer was responsible for prison security, which is what her speech addressed, but Vose was not responsible for policing the major case unit detectives. This distinction fails as well, since Vose was employed to oversee the narcotics unit's investigations, which Vose himself stated could have been compromised by the alleged misconduct of the major case unit detectives. Like the corrections officer, Vose was merely doing his job when he reported to his superiors his suspicions of the detectives' misconduct. A public employee's more general responsi-

bilities are not beyond the scope of official duties for First Amendment purposes. *See Garcetti*, ___ U.S. at ___, 126 S.Ct. at 1961; *Spiegla*, 481 F.3d at 966.

Finally, Vose attempts to distinguish *Sigsworth v. City of Aurora*, 487 F.3d 506 (7th Cir. 2007). *Sigsworth* involved a police investigator working on a multi-jurisdictional task force investigating gang and drug activity. 487 F.3d at 508. Sigsworth, the police investigator, suspected that certain task force members were tipping off the targets in a task force drug raid, and reported this concern to his supervisors. *Id.* This Court found that Sigsworth "was merely doing what was expected of him" as a member of the task force with supervisory responsibilities and pursuant to task force policy, and therefore his speech was not entitled to First Amendment protection. *Id.* at 511.

Vose claims that the voluntary and independent nature of his investigation into the suspected wrongdoings of the major case unit detectives was not expected of him as a supervisor in the narcotics unit, which distinguishes him from Sigsworth. Again, Vose ignores his own statements that his independent investigation stemmed from his concerns about how the detectives' misconduct might affect his work in the narcotics unit. Ensuring the lawful operations of narcotics investigations was clearly expected of Vose.

In his final argument, Vose asserts that *Garcetti* was a narrow decision limited to the facts of the case.[4] Vose

---

[4] *Garcetti* involved a deputy district attorney who alleged that he was subjected to employment retaliation for writing a disposition memorandum in which he recommended dismissal of a case on the grounds of government misconduct. The Supreme Court held that the deputy district attorney's memorandum was
(continued...)

asks us to interpret the holding in *Garcetti* to mean that only speech pursuant to a public employee's ordinary daily job duties are unprotected by the First Amendment. Such a reading, Vose claims, will foster the free flow of ideas as constitutionally guaranteed by the First Amendment. We decline to read beyond the text of *Garcetti* since we consider the *Garcetti* standard of "official duties" to be clear enough. While Vose may have gone beyond his ordinary *daily* job duties in reporting the suspected misconduct outside his unit, it was not beyond his official duty as a sergeant of the narcotics unit to ensure the security and propriety of the narcotics unit's operations.

For the reasons stated, we find that Vose's speech, albeit an honorable attempt to correct alleged wrongdoing, was not protected by the First Amendment. Kliment and Rouse are entitled to qualified immunity. Because no constitutional right was violated, Vose's complaint fails to state a claim under § 1983.

## III. Conclusion

We REVERSE the district court's holding that Kliment and Rouse were not entitled to qualified immunity.

---

⁴ (...continued)
work product created while performing his official duties, and therefore was not entitled to First Amendment protection. *See generally Garcetti*, ___ U.S. ___, 126 S.Ct. 1951.

A true Copy:

     Teste:


_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*