In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-2165

RICHARD P. GRABER,

*Plaintiff-Appellant,*

*v.*

DAVID A. CLARKE, JR. and COUNTY OF
MILWAUKEE,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:11-cv-01038-WEC — **William E. Callahan, Jr.**, *Magistrate Judge.*

ARGUED JANUARY 8, 2014 — DECIDED AUGUST 18, 2014

Before BAUER, WILLIAMS, and TINDER, *Circuit Judges.*

BAUER, *Circuit Judge.* Former Deputy Sheriff Sergeant
Richard Graber ("Graber") filed suit against Sheriff David
Clarke ("Clarke") and the County of Milwaukee alleging three
violations of his federal and state rights. In Counts I and II,
Graber claims the defendants violated his federal First Amend-
ment rights to free speech and association; Count III alleges

that the defendants violated the Wisconsin Law Enforcement Officer's Bill of Rights.

Following a bench trial, the district court dismissed the action with prejudice. Graber timely appealed to this court. For the following reasons, the decision of the district court is affirmed.

## I. BACKGROUND

In June 2010, Graber was employed as a Deputy Sheriff Sergeant at the Milwaukee County Correctional Facility-Central ("the jail") and served as the vice president of the Milwaukee Deputy Sheriffs' Association ("the union"). As vice president of the union, Graber's responsibilities included attending various meetings where members discussed topics impacting the union, including issues related to wages, hours, and conditions of employment.

O'Donnell Park, located on Milwaukee's lakefront, is a Milwaukee County facility under the control of the Sheriff's Office.

On June 24, 2010, a fifteen-year-old boy was killed when a large concrete slab fell from the O'Donnell Park parking garage. The boy's mother and friend were also injured in the incident. The Sheriff's Office responded to the emergency, in part by securing the inner perimeter of the park. Captain Thomas Meverden ("Meverden") of the Patrol Division was the incident commander on the scene; he immediately assigned the task of securing the park perimeter to deputy sheriffs at the jail. The deputies were informed to stay for mandatory overtime even if their usual shifts were over. Meverden also

ordered Sergeant Carol Mascari ("Mascari") to assist him by making calls for volunteers in an effort to comply with the union's collective bargaining agreement.[1]

## A. Conversation with Mascari and Meverden

Graber arrived at work on June 25, 2010, for his shift as the Intake Booking Sergeant; he was not one of the deputies sent to the park and did not have any responsibilities related to staffing deputies. A fellow jail deputy who had been assigned to secure the park's perimeter approached Graber and complained to him about the mandatory overtime. Graber called Deputy Roy Felber ("Felber"), the union president, with whom he spoke once or twice daily regarding union issues. Felber, who had not yet heard about the mandatory overtime assignments, told Graber to handle the situation on behalf of the union.

---

[1] The collective bargaining agreement's overtime provision, 3.02, provides that "[a]ll scheduled overtime shall be assigned within classification as follows:

> (c) In the event an employee refuses to accept an overtime assignment or there are insufficient volunteers for the work unit where overtime is required, the least senior employee in the classification in the work unit shall be required to work the overtime assignment.
> …
> (e) For an event identified by the Sheriff as a Special Event, the above procedure shall be utilized on a departmental basis. In the event there are insufficient volunteers for a Special Event overtime assignment the Sheriff shall rotate in the inverse the order of seniority among all employees in the department in the classification."

Graber then called Mascari to say that he thought the mandatory overtime violated the union's collective bargaining agreement. Meverden, overhearing Graber on speakerphone, picked up the line and explained to Graber that the mandatory overtime was necessary in the wake of the tragedy at the park and so did not violate the collective bargaining agreement. Meverden informed Graber that volunteers could not be mobilized quickly enough, that the park perimeter needed to be secured immediately, and that only jail deputies were available to meet the park staffing needs.[2] Meverden went on to explain that volunteer staffing would begin that evening to comply with the collective bargaining agreement. While the discussion with Graber was described by Mascari as "heated" at times, Meverden and Mascari testified that they never thought Graber was being rude or insubordinate or impeding their ability to handle the staffing at the park. The conversation ended with both men thinking the matter was resolved.

Shortly after this phone call, Deputy Joseph Quiles ("Quiles") approached Graber to complain that he had been assigned mandatory overtime at the park. Quiles, who testified that he spoke to Graber because of his role as the union vice president, informed Graber that he had worked at the jail on July 24 from 2:00 p.m. until 10:00 p.m., was immediately assigned to overtime at the park until 8:30 a.m. the next day,

---

[2] Deputies from other divisions were unavailable to assist with securing the park perimeter; they were already working overtime and "extended" for various assignments, primarily related to a large Milwaukee music festival, "Summerfest," which had opened the day the parking garage incident occurred.

and was then supposed to return to work at the jail for an eight-hour shift beginning at 2:00 p.m. on July 25. At trial, Graber testified that his conversation with Quiles made him concerned for Quiles' and other deputies' safety and that the public's safety was in jeopardy because deputies typically required at least eight hours of rest between shifts in order to be fully vigilant while performing their duties.

### B.  Encounter with Nyklewicz

Graber then briefly encountered Deputy Inspector Kevin Nyklewicz ("Nyklewicz") in the administration area of the jail. At trial, the two men disputed the details of what transpired in their short conversation. Graber's version is that Nyklewicz approached him first to discuss a union matter unrelated to the incident at the park. Graber then calmly informed Nyklewicz that he was concerned about the working conditions of jail deputies assigned to mandatory overtime at the park. Graber said he was worried that the deputies would get "burned out" from the extra work with so little time between shifts, and that in turn would put the public's safety at risk.

According the Nyklewicz, however, Graber approached him first and began yelling that Clarke was "screwing" with jail deputies and Graber was "sick of it." Nyklewicz contended that Graber did not mention the union or that he thought the mandatory overtime violated the collective bargaining agreement. Nyklewicz asserted that Graber always brought up the union specifically when the two spoke in the past about union-related issues. Nyklewicz testified that when he tried to end the conversation by saying he would look into the matter and telling Graber to return to work, Graber continued to be

aggressive and called the situation "ridiculous." Nyklewicz thought that Graber was being insubordinate because he was challenging the authority of his superiors, disregarding direct orders, and personally attacking Clarke. Nyklewicz said that in the nineteen years he had served in law enforcement, he had never before been spoken to by a subordinate officer in such a manner.

As a result of this encounter, Nyklewicz sought to open an internal affairs investigation against Graber. Lacking the authority to discipline Graber himself, Nyklewicz went to Inspector Edward Bailey ("Bailey"), the assisting officer to Clarke. Bailey testified that an "irate" Nyklewicz said he was approached by Graber who made remarks about Clarke "screwing" with the jail deputies. Bailey decided that since Graber's complaint was directed towards Clarke personally, he would inform Clarke of the matter before taking disciplinary action.

Later that morning, Bailey told Clarke about Graber's remarks. Bailey expressed his concern over Graber's disre-spectful comments towards superior officers. Bailey also thought that Graber was essentially forcing Clarke to "re-justify" his decision to staff jail deputies at the park in the midst of an emergency. Rather than open an internal affairs investigation, Clarke ordered Bailey to schedule a meeting with Graber later that day so that Clarke could speak with him directly about the situation.

### C. Meeting with Clarke and Bailey

Graber, Clarke, and Bailey met later that day; each had a different account of what transpired during the meeting.

According to Graber, the meeting lasted about two hours and consisted of Clarke going on an aggressive tirade in an effort to "bully" and "intimidate" him. Clarke's profanity-ridden rant included yelling, pointing, and calling Graber "waste," an "organizational terrorist," a "fucker," and a "cancer to the agency." Graber said Clarke got close to his face and yelled, "I've got a dead child at the lakefront and you're questioning mandatory overtime? You sick fuck, you." Clarke told Graber that he had been hearing Graber's name too much and that Graber needed to take union matters to Inspector Carr. Clarke said if he heard Graber's name again, he would "come after" him. Graber said Clarke made him feel "intimidated, fearful, and scared."

Clarke's version of the meeting was that he never used profanity towards Graber directly, but he did tell Graber that he was being "insubordinate" and "interfering with [the] command staff's carrying out of [Clarke's] orders." Clarke admitted to using profanities in general and telling Graber to take union matters to Inspector Carr, but denied ever threatening to "come after" Graber. Clarke also admitted to calling Graber an "organizational terrorist," but said he used the term in the context of Graber being self-centered in the middle of an emergency. Clarke asserted that Graber was the first to bring up the union issue. He told Graber that he could file a grievance if he had concerns involving the union, but he needed to stay out of the command staff's way.

According to Bailey, Clarke was "very direct" when he confronted Graber about "blocking the allocation of resources to O'Donnell Park," but Clarke never yelled, pointed, or used "unending profanities and vulgarities." Bailey said Graber

was the first to bring up unions, but that it was "in deflection" to Clarke's comments about command issues. When Clarke brought up the "dead child at the lakefront," Bailey said Graber expressed no concern for the victims of the accident. At this point, Bailey said the meeting turned into an "argumentative," "intense," and "heated" conversation. Bailey confirmed that Clarke told Graber to take union matters to Inspector Carr and that if Graber had issues, he could "file all the grievances [he] want[s]." Bailey further testified that whenever Graber pressed the union issue, Clarke would tell him that the problem was not about unions but rather about the emergency at O'Donnell Park and obeying direct orders. Bailey said Clarke did most of the talking and that the meeting ended when Clarke told Graber he was free to leave.

### D.  Events After June 25, 2010

After the meeting, neither Graber nor any other union member filed a grievance concerning the mandatory overtime staffing at the park. However, Graber began to withdraw from union activities, had trouble focusing, and called in sick to work more frequently. Graber said he was afraid to perform his job responsibilities because he felt the Sheriff's Office was "trying to find fault" in his work so that they could discipline or terminate him.

In November 2010, Graber received a seven-day suspension as a result of an investigation that started in December 2009. The investigation arose because Graber signed a subordinate's deficient memo book. Other sergeants signed the same memo book, but only Graber was subject to an investigation. In May 2011, Graber testified about the suspension in a hearing before

the Wisconsin Employment Relations Committee and said he was "not [] disciplined for [his] conduct as a union official for anything about O'Donnell Park." The arbitrator overturned Graber's suspension, finding that the County lacked just cause to discipline him. Prior to the O'Donnell Park incident, Graber had received three other suspensions from Clarke that were overturned. Graber asserts that he had worked for four Sheriffs before Clarke and had never been disciplined by any of them.

In November 2011, Graber brought suit against Clarke and the County of Milwaukee. He argued that Clarke violated his First Amendment rights under 42 U.S.C. § 1983 when he retaliated against Graber for his association and speech during their meeting on June 25, 2010. Additionally, Graber argued that Clarke infringed upon his rights to engage in political activity and retaliated against him in violation of the Wisconsin Law Enforcement Officer's Bill of Rights pursuant to Wis. Stat. §§ 164.015 and 164.03. In May 2012, Graber was granted disability retirement at the age of forty-five, retroactive to July 2011. Graber asserted that his early retirement was because of "on-the-job stress caused by Sheriff Clarke."

After a two-day bench trial, both parties submitted briefs to the court. On May 7, 2013, the district court dismissed Graber's claims, concluding that his First Amendment rights were not violated and that he did not establish a violation of the Wisconsin Law Enforcement Officer's Bill of Rights. The court reasoned that while Graber's conversation with Mascari and Meverden was protected under the First Amendment, his brief discussion with Nyklewicz, which led to his meeting with Clarke, was not. Additionally, the court held that Graber did not present evidence that he engaged in a political activity and

therefore could not be retaliated against for engaging in such activity. Graber timely appealed to this court.

## II. DISCUSSION

We first note that Graber has not presented an argument on appeal in regard to Count III pursuant to the Wisconsin Law Enforcement Officer's Bill of Rights, as codified in Wis. Stats. §§ 164.015 and 164.03. Since the claim was not pursued on appeal, we will not consider it here. *See, e.g., Barnickel v. United States*, 113 F.3d 704, 706 (7th Cir. 1997).

Before delving into Graber's arguments regarding free speech, we address Graber's allegations regarding freedom of association. Evidence presented to the district court shows that Graber's freedom of association claims are predicated upon his freedom of speech claims related to the same incidents that occurred on June 25, 2010. The district court found that because Graber's speech and association claims were intimately intertwined, the claims should be analyzed together. *See Balton v. City of Milwaukee*, 133 F.3d 1036, 1041 (7th Cir. 1998) (Cudahy, J., concurring) (arguing that the *Connick/Pickering* test may not be transferable to a "pure association claim," the analysis applies to "hybrid" claims where both speech and association are involved). We agree and will address Graber's First Amendment claims together.

"Whether a government employee's speech is protected by the First Amendment is a question of law." *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002). A district court's legal conclusions are reviewed *de novo*. *Id*. As to issues of fact, this court defers to a district court's findings and will uphold such findings unless clearly erroneous. *Id*. A finding is considered

clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

To prove a First Amendment employment retaliation claim under 42 U.S.C. § 1983, a plaintiff must establish three primary elements. First, the plaintiff must show that his speech was constitutionally protected. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Second, the plaintiff must prove that he suffered an adverse employment action as a result of his protected speech that was sufficiently adverse so as to deter the exercise of the free speech. *Vose v. Kliment*, 506 F.3d 565, 569–570 (7th Cir. 2007). And third, the plaintiff must present evidence to establish that a reasonable jury could find that his speech was a "substantial" or "motivating" factor for his adverse employment action. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

### A.  Conversation with Mascari and Meverden

To determine if speech is constitutionally protected, we employ a two-part inquiry established by the Supreme Court in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968). First, we ask whether the plaintiff spoke as a citizen on a matter of public concern; if so, we ask whether the plaintiff's interest in speaking as a citizen on a matter of public concern outweighed the government's interest in controlling that speech to promote the efficiency and effectiveness of serving the public through its employees. *Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir. 2007) (citing *Pickering*, 391 U.S. at 568).

We begin our analysis by determining whether Graber spoke as a citizen in his first conversation with Mascari and Meverden. On the morning of June 25, 2010, after being informed that jail deputies were forced to work overtime at O'Donnell Park, Graber called the union president because he thought the mandatory overtime violated the union's collective bargaining agreement. The union president told Graber to handle the situation, so he initiated a discussion with Mascari and Meverden, both of whom were directly involved with assigning deputies to work overtime at O'Donnell Park. The First Amendment does not protect a public employee's expressions made "pursuant to his or her official responsibilities," but if the public employee is speaking in his capacity as a union representative, he is speaking as a citizen. *Garcetti*, 547 U.S. at 424; *Fuerst v. Clark*, 454 F.3d 770, 774 (7th Cir. 2006). Graber testified that he called Mascari as the union vice president with the belief that he was performing "Step 1" of the union's grievance process.[3] Both Mascari and Meverden also testified that they were generally under the impression that they were speaking to Graber in his capacity as the union vice president. The record makes evident that Graber was speaking with Mascari and Meverden in his capacity as the union vice president and thus as a citizen.

---

[3] "Step 1" of the union's grievance process requires that "[t]he employee alone or with his/her representative explain the grievance verbally to the person designated to respond to employee grievances in his/her department." "Step 2" of the process calls for a "grievance in writing on the Grievance Initiation Form."

Since we conclude that Graber was speaking as a citizen during this first conversation, we next assess whether he was speaking on an issue of public concern. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1123 (7th Cir. 2009) (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)). Content is the most important of these three factors. *Gustafson*, 290 F.3d at 907. This court has recognized that union activity, "in a broad sense, touches upon matters of public concern," but that does not automatically make the expression protected by the First Amendment. *Gregorich v. Lund*, 54 F.3d 410, 415 (7th Cir. 1995). If the record demonstrates that Graber sought "to bring about change with public ramifications extending beyond the personal," he was speaking on a matter of public concern. *Kristofek v. Vill. of Orland Hills*, 712 F.3d 979, 986 (7th Cir. 2013).

Graber initiated the call to Mascari after being informed of the mandatory overtime because he was concerned that the staffing decisions violated a union provision and raised safety issues for union members as well as the general public. Graber was not assigned mandatory overtime at O'Donnell Park, so his concerns did not arise from personal issues. Graber was also unaware at the time he called Mascari that the mandatory overtime was only a temporary action taken by the Sheriff's Office in response to the emergency. He did not know that jail deputies were asked to work overtime only because they were the only deputies available to secure the park and deputies in other divisions were already "extended." He was also unaware that the jail deputies would be returning to their normal

staffing schedules that evening. Because he lacked this infor-
mation, Graber was legitimately concerned that deputies were
not getting sufficient rest, raising a potential threat to their
safety and the safety of the public. Graber's speech addressed
"public ramifications" that extended "beyond the personal," so
we find that he was speaking with Mascari and Meverden
about a matter of public concern.

Moving to the second part of the *Pickering* test, we ask
whether Graber's interest in ensuring the safety of deputies
and the public outweighed the interest of the government "in
promoting effective and efficient public service." *Spiegla*, 481
F.3d at 965 (citing *Pickering*, 391 U.S. at 568). This court has
identified certain factors that should be considered when
determining whether the government's interest outweighs the
First Amendment interests of a public employee. *Gustafson*, 290
F.3d at 909. These factors include:

> (1) whether the speech would create problems in
> maintaining discipline or harmony among coworkers;
> (2) whether the employment relationship is one in
> which personal loyalty and confidence are necessary;
> (3) whether the speech impeded the employee's ability
> to perform [his] responsibilities; (4) the time, place, and
> manner of the speech; (5) the context within which the
> underlying dispute arose; (6) whether the matter was
> one on which debate was vital to informed decision-
> making; and (7) whether the speaker should be re-
> garded as a member of the general public.

*Id.* (citing *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000)). In
balancing Graber's protected speech against the government's

interests, it is unnecessary for us to address each of the seven factors in turn. The record makes evident that the conversation between Graber, Mascari, and Meverden was brief, calm, and both Mascari and Meverden testified that Graber did not interfere with their staffing duties. Graber in no way impeded the ability of the Sheriff's Office to serve the public efficiently and effectively when he raised the mandatory overtime issue with Mascari and Meverden. Moreover, testimony from Graber and Meverden established that at the end of their conversation, both men felt the issue had been resolved. Graber's interest in ensuring the safety of deputies and the public outweighed the government's interest in effective public service. We therefore find that Graber's speech with Mascari and Meverden is protected by the First Amendment.

## B.  Encounter with Nyklewicz

Shortly after the conversation with Mascari and Meverden, Quiles approached Graber to inform him of the long hours he was assigned to work and the short period of rest he was given between shifts. At this point, Graber's concerns involving potential safety issues or violations of the union's collective bargaining agreement were allayed by his conversation with Mascari and Meverden. If Graber had remaining concerns after speaking with Quiles, he could have proceeded through the usual channels and filed a grievance related to the mandatory overtime and the potential violation of the collective bargaining agreement. Instead, he chose to aggressively approach Nyklewicz, a superior who was not directly responsible for any of the staffing decisions related to the O'Donnell Park emergency.

Graber argues that he approached Nyklewicz in his capacity as the union vice president. By bringing up how Quiles' was not getting enough rest, Graber claims he was addressing concerns about the deputies' hours and conditions of employment that compromised the safety of union members and the public. Nyklewicz, however, testified that Graber approached him in a hostile and insubordinate manner, and that nothing about the union or the collective bargaining agreement was discussed. The district court found Nyklewicz to be a credible witness and determined that Graber's speech was that of a disgruntled employee, not a citizen. "The district court's evaluation of witness credibility will not be disturbed unless it is completely without foundation." *United States v. Ferguson*, 35 F.3d 327, 333 (7th Cir. 1994). In light of this deference to the district court's determination, we are compelled to agree.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421. Graber argues that he was not speaking as a deputy when he approached Nyklewicz about the overtime issue since he had not been forced to work the mandatory overtime. This, however, does not take into consideration that Graber's comments to Nyklewicz were hostile and directed at Clarke personally for "screwing" with jail deputies. Nyklewicz also testified that when Graber spoke about union issues in the past, he always mentioned the union or its members, neither of which were brought up during this brief encounter. Furthermore, Graber's comments specifically

referred to jail deputies, not deputies on a department-wide basis. If he was functioning as a union vice president when speaking with Nyklewicz and implicating a public interest, he would have been concerned for all deputies who were getting insufficient rest, not just those under his control at the jail. Thus, we find that Graber was not speaking with Nyklewicz as a citizen for First Amendment purposes.

Even if we were to conclude that Graber was speaking as a citizen when he spoke with Nyklewicz, a review of the content, form, and context of his speech shows that he was not speaking on a "matter of public concern." While "[i]t would be difficult to find a matter of greater public concern in a large metropolitan area than police protection and public safety," *Gustafson*, 290 F.3d at 907 (quoting *Auriemma v. Rice*, 910 F.2d 1449, 1460 (7th Cir. 1990) (*en banc*)), no such matters were discussed between Nyklewicz and Graber. Nyklewicz said Graber's speech disrespected his superiors, interfered with the efficiency of the workplace, and forced the command staff to justify their decisions in the face of an emergency. The Supreme Court noted in *Connick* that the First Amendment does not protect an employee's action that his supervisor "reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." 461 U.S. at 154. In Nyklewicz's view, Graber's actions were taking time and energy away from the officers whose duties were to staff the park for the safety of the public in the midst of an emergency as well as find volunteers to take over for those deputies in order to comply with the union's collective bargaining agreement. "Deference to the employer's judgment regarding the disruptive nature of an employee's speech is especially important in the context of law

enforcement." *Kokkinis v. Ivkovich*, 185 F.3d 840, 845 (7th Cir. 1999).

Graber contends that his motive in approaching Nyklewicz was to ensure the safety of the public as well as union members. The record as a whole, however, tells a different story. Graber never mentioned the union or the collective bargaining agreement in his conversation with Nyklewicz. "[I]f the objective of the speech … is simply to further a purely personalized grievance, then the speech does not involve a matter of public concern." *Kristofek*, 712 F.3d at 986. Given the aggressive manner in which Graber approached Nyklewicz, his personal attack of Clarke, and the fact that he had already spoken with Mascari and Meverden about union issues, Graber's interaction with Nyklewicz appears motivated by his frustration over the department's decision to have jail deputies working overtime. Such a motivation is personal, and the speech should be considered that of an upset employee over matters personally affecting him. *See Metzger v. DeRosa*, 367 F.3d 699, 702 (7th Cir. 2004) ("[W]here considerations of motive and context indicate that an employee's speech raised a topic of general societal interest merely for personal reasons rather than a desire to air the merits of the issue, … these factors militate against the conclusion that the employee's speech is entitled to First Amendment protection.") (quoting *Campbell v. Towse*, 99 F.3d 820, 827 (7th Cir. 1996)).

Since we find that Graber was not speaking as a citizen on a matter of public concern with Nyklewicz, we need not go further; his speech does not warrant First Amendment protection. *See, i.e., Spiegla*, 481 F.3d at 965 ("First, we inquire whether the employee spoke as a citizen on a matter of public concern.

If not, the employee has no cause of action for First Amendment retaliation and there is no need to reach the second part of the test, which requires a balancing of the employee's interest … against the public employer's interest … .") (internal quotations and citations omitted).

## C. Adverse Employment Action and Causation

Graber argues that he experienced adverse employment actions after his conversations with Mascari, Meverden, and Nyklewicz since he received a seven-day suspension in November 2010, and a two hour "verbal assault" by Clarke. The district court found that Graber's suspension was not a result of his speech on June 25, 2010, and so could not qualify as an adverse employment action for retaliation purposes. The court "assumed" that Clarke's comments to Graber constituted a violation of his First Amendment rights due to the fact that Clarke criticized Graber "to an unnecessarily belittling degree" in a "vulgarity-laden" meeting. However, even if a plaintiff proves that he experienced an adverse employment action, he must still show causation between his speech and the adverse action. *Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 287. The court found that Graber failed to show that the protected statements he made to Mascari and Meverden motivated the scathing comments by Clarke.

We first address whether Graber established an adverse employment action related to his suspension. To determine whether an action is sufficiently adverse, it must present an actual or potential danger of deterring or chilling the plaintiff's exercise of free speech. *DeGuiseppe v. Village of Bellwood*, 68 F.3d 187, 191 (7th Cir. 1995). The defendants concede that if the

seven-day suspension was issued in retaliation for Graber's constitutionally protected speech, it would be an actionable offense under § 1983. However, the record does not show a causal connection between Graber's comments on June 25, 2010, and the seven-day suspension he received for the signing of a deficient memo book in 2009. The actual suspension did not occur until November 2010, but the investigation of the memo book incident commenced in December 2009, over six months before the O'Donnell Park incident. Although Graber's speech preceded the suspension, without other evidence linking the two events, we cannot find the suspension was motivated by that speech. *See Mullin v. Gettinger*, 450 F.3d 280, 285 (7th Cir. 2006) ("[T]he fact that a plaintiff's protected speech may precede an adverse employment decision alone does not establish causation."). Perhaps most significantly, when Graber was specifically asked at his suspension hearing whether the seven-day suspension was linked to any comments he made on June 25, 2010, Graber admitted that he "was not disciplined for [his] conduct as a union official for anything about O'Donnell Park."

We now turn to whether Clarke's hostile meeting with Graber qualified as an adverse employment action. "[R]etaliation need not be monstrous to be actionable under the First Amendment … 'A campaign of petty harassment may achieve the same effect as an explicit punishment.'" *DeGuiseppe*, 68 F.3d at 192 (quoting *Walsh v. Ward*, 991 F.2d 1344, 1345 (7th Cir. 1993)). Graber claims that the purpose of the meeting was for Clarke to "intimidate and harass him," that he was directly threatened by Clarke, and that he experienced great stress as a result. For the sake of brevity, we will assume that the heated

meeting was an adverse employment action and discuss the more pressing issue: whether Graber's protected speech motivated his "dress down" by Clarke.

"In the end, the plaintiff must demonstrate that, but for his protected speech, the employer would not have taken the adverse action." *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012). As discussed above, Graber's conversation with Mascari and Meverden was protected by the First Amendment, but his comments to Nyklewicz were not. Therefore, Graber must show that but for his discussion with Mascari and Meverden, Clarke would not have called the extended meeting with Graber.

The evidence is insufficient to show that but for Graber's conversation with Mascari and Meverden, he would not have been "bullied" by Clarke in their meeting. Clarke and Bailey testified at trial that the reason the meeting was called with Graber was because of Nyklewicz's complaints. The meeting between Clarke and Graber would have occurred even if the conversation with Mascari and Meverden never happened. While additional testimony revealed that Graber's conversation with Mascari and Meverden may have been brought up during the extended meeting with Clarke, the purpose and focus of the meeting related to Graber challenging orders, blocking department resources, personally attacking Clarke, and acting insubordinate in his encounter with Nyklewicz. Clarke's belittling "dress down" of Graber, even when considered an actionable offense, was due to the aggressive and insubordinate manner in which Graber spoke to Nyklewicz; it was not the result of any protected speech in which Graber engaged.

### III. CONCLUSION

Graber failed to establish a causal connection between his constitutionally protected speech and an adverse employment action. The decision of the district court is AFFIRMED.