In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-4040

DANIEL J. WACKETT,

*Plaintiff-Appellant*,

*v.*

CITY OF BEAVER DAM, WISCONSIN, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 08-C-181—**William C. Griesbach**, *Judge.*

ARGUED DECEMBER 2, 2010—DECIDED JUNE 13, 2011

Before EASTERBROOK, *Chief Judge*, and MANION and WILLIAMS, *Circuit Judges*.

MANION, *Circuit Judge.* Daniel Wackett sued the City of Beaver Dam and several current and former members of the Board of Public Works and City Council. Wackett alleged the defendants violated his First Amendment rights when he spoke out against their recommendation to purchase a Caterpillar front-end loader. He claims

they retaliated against him by not appointing him Director of Public Works. Wackett also alleged supplemental state law claims for unjust enrichment and quantum meruit. The district court granted the defendants summary judgment on Wackett's First Amendment claim and declined to exercise jurisdiction on the state law claims. We affirm.

I.

Daniel Wackett began working for the City of Beaver Dam, Wisconsin, in its Department of Public Works ("Department") in November 1972. Through the years, Wackett advanced through the ranks in the Department and in 1990 was promoted to the position of Public Works Supervisor. In line with his responsibility as Public Works Supervisor, Wackett was charged with determining the performance specifications for a front-end loader tractor which Beaver Dam needed to purchase.

On February 17, 2003, Wackett attended a Board of Public Works ("Board") meeting at which the Board considered three bids for the needed front-end loader. At this meeting, which was open to the public, Wackett and his boss, Director of Public Works Bruce Gall, recommended that the Board accept the bid for a unit manufactured by John Deere. The John Deere tractor was the lowest of the three qualifying bids. However, the Board voted 3-0 to pass a resolution recommending to the Beaver Dam Common Council that the city purchase a tractor manufactured by Caterpillar, which cost about $10,000 more than the John Deere tractor.

The Board held another meeting on February 24, 2003. All five Board members were present at this meeting and the Chairman of the Board, Jeffry Kohman, said that he wanted one hundred percent support for the Board's recommendation to purchase the Caterpillar tractor. The Board then re-voted on its resolution to the Common Council recommending the purchase of the Caterpillar front-end loader, and the resolution passed by a 4-1 vote. The four Board members who voted in favor of the resolution are the individual defendants in this case, Terry Capelle, Jeffry Kohman, Laine Meyer, and Gina Staskal.

After the Board approved the purchase of the Caterpillar tractor, Wackett claims he publicly spoke out against the decision, telling people that the Board should not have voted to recommend accepting a bid that was $10,000 higher than the lowest qualifying bid. Wackett also claims he publicly spoke out about his concern that the Board's decision to purchase the more expensive front-end loader was improperly influenced by personal relationships with the Caterpillar sales representative. He also claimed they were influenced by the representative's invitation to the Board for an overnight trip to Chicago and a tour of the Caterpillar plant. Wackett maintains that he had publicly spoken out against this "unethical" all-expense-paid trip when the invitation was originally extended in June 2002.

Wackett claims that he spoke out to many individuals, but he focuses on his comments to a local businessman, Jeff Schmidt. Schmidt had a local grading and excavating company and was thus familiar with various types of

construction equipment. Wackett claims that he provided Schmidt with information concerning the Board's decision and encouraged Schmidt to write a letter to the Common Council and the mayor criticizing the purchase.

Schmidt complied, writing to both the mayor and the Common Council. In this letter dated February 24, 2003, Schmidt chastised the Board for its recommendation to purchase the Caterpillar and urged the City to "go along with the INITIAL opinion of the Director of Public Works (Bruce Gall) and the Street Superintendent (Dan Wackett), which was to purchase the JOHN DEERE unit as bid." Schmidt ended the letter with a post-script: "P.S. To interested citizens! Final council vote on this issue is Monday, March 3, 2003 at 7:00 p.m. at City Hall as I understand. Call or write your Alderperson or Mayor!" Schmidt copied the Beaver Dam Daily Citizen editor with this letter and the local newspaper printed the letter in its entirety.

Following the reprinting of the letter, numerous citizens complained about the Board's recommendation to purchase the Caterpillar front-end loader. In response, the Chairperson of the Board decided to pull the Board's recommendation to purchase the Caterpillar tractor from the Common Council agenda. The Board then revisited the issue at its March 10, 2003, meeting. At that meeting, Wackett provided information which countered the Board members' claim that the Caterpillar tractor was more economical than the John Deere based on maintenance costs. Nonetheless, the Board voted to reintroduce the resolution to the Common Council to

purchase the Caterpillar front-end loader. On March 17, 2003, the Common Council voted to reject the Board's recommendation to purchase the Caterpillar tractor. Two weeks later the Board changed its recommendation to the John Deere tractor; the Common Council approved this recommendation.

In July 2003, shortly after the front-end loader debate, the Director of Public Works, Bruce Gall, retired. The mayor appointed Wackett to serve as the Acting Director, but then in October 2003, the Common Council appointed John Bemis, a subordinate of Wackett, to be the new Director. Bemis resigned in July 2004. After Bemis's resignation, defendant Terry Capelle made it known that there was "no way that Wackett will ever get [the Director of Public Works] job." Capelle and the mayor then appointed Chris Liveris, the Water Utility Superintendent, as the Acting Director of Public Works. After appointing Liveris, Capelle told Liveris to "get that son of a bitch," referring to Wackett. Capelle also told Liveris, "Now that Gall is gone, Wackett is the next to go," and suggested that Liveris "nail 'em."

Liveris lasted only a few months in the Acting Director role, resigning in September 2004. The mayor then appointed Wackett to again serve as Acting Director. Wackett then applied for the permanent position and the interview committee unanimously recommended that the Board hire him as the Director. But the Board rejected the recommendation. The City then posted the job two more times, but the City rejected Wackett's additional applications. Instead Capelle recommended a

candidate whom the Common Council later rejected as unqualified. During this entire time—from September 2004 until his retirement in February 2009—Wackett continued to serve as the Acting Director. Wackett did not receive any additional compensation for performing the Acting Director's duties in addition to his supervisory duties.

After he retired, Wackett sued the City of Beaver Dam and Capelle, Kohman, Meyer, and Staskal under § 1983, alleging the defendants retaliated against him because of his public speech about the tractor. Wackett also asserted state law claims for unjust enrichment and quantum meruit. The district court granted the defendants' motion for summary judgment, concluding that Wackett had not spoken out on a matter of public concern and that even if he had, the defendants were not aware of his protected speech and therefore could not have retaliated against him. Wackett appeals.

II.

On appeal Wackett maintains that the district court erred in granting the defendants summary judgment on his First Amendment retaliation claim. We review the grant of summary judgment *de novo* and view the evidence in the light most favorable to Wackett. *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 703 (7th Cir. 2010). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"[T]he First Amendment, made applicable to the states through the Fourteenth Amendment, prohibits the government from retaliating against its employees for engaging in protected speech." *Gross*, 619 F.3d at 703-04. To state a retaliation claim under § 1983, Wackett must prove that: (1) his speech was constitutionally protected; (2) the protected speech was a but-for cause of the employer's action; and (3) he suffered a deprivation because of the employer's action. *Id.* at 704.

In this case, Wackett claims he engaged in protected speech by: publicly criticizing the Board's recommendation to purchase the Caterpillar; positing that that decision was improperly influenced by personal relationships with the Caterpillar salesman and the invitation for a free overnight trip to Chicago followed by a tour of the Caterpillar plant; and making his earlier statements that it was illegal and unethical to accept that all-expense-paid trip. The problem for Wackett, though, is that he publicly criticized the Board's decision to purchase the Caterpillar during two Board meetings at which he was speaking in his official capacity. And while overseeing the bidding process as part of his official duties, Wackett also spoke with City officials of his belief that it was improper for members of the Board to accept a trip to tour the Caterpillar plant during the bidding process. As the Supreme Court explained in *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."

Wackett attempts to avoid the import of *Garcetti* by claiming that in addition to speaking out against the Caterpillar purchase and the unethical free trip in his role as a Public Works employee, he also spoke out on his personal time as a private citizen and taxpayer. Even if repeating statements made earlier as part of an employee's official duties were enough to trigger First Amendment protection, Wackett's theory cannot stand because there is no evidence that the defendants knew of Wackett's additional "unofficial" speech. While the defendants (or most of them) were aware of the Schmidt letter, all of the defendants filed declarations stating that they did not know that Wackett had spoken with Schmidt or any other members of the public concerning the front-end loader issue. There is also nothing in Schmidt's letter to indicate that Wackett had spoken to him about the tractor purchase; rather, Schmidt's letter incorporates information made available at the public Board hearings. Moreover, while the letter references Wackett, it also references Wackett's boss, Gall, and refers to their initial recommendation to purchase the John Deere tractor. That initial recommendation was made at the public hearing. Thus, if anything, the content of the letter indicates that Schmidt was relying on Wackett's recommendations made during the public hearings—when he was acting in his official capacity. There is also no evidence that the defendants knew Wackett had publicly spoken out against the offer of the Caterpillar trip.

Wackett responds that the defendants must have known of his allegedly protected speech because the

"defendants' attitude and the intensity and maliciousness of their hostility toward Wackett increased markedly during and after he spoke out about the [Board's] end loader purchase recommendation." He insists that "there really was no other way to explain the intensity of defendants' hostility toward Wackett or their desire to 'get' Wackett." But as Wackett himself points out, the defendants expressed displeasure over his public recommendation during the first Board meeting, and there is no evidence that their unhappiness with Wackett came from things he said outside of his official role. Wackett also claims there is no reason—other than retaliation—to explain why the defendants kept Wackett in the Acting Director role for so long, while denying him the Director position.

This argument is circular: Wackett is essentially maintaining that the defendants must have known about his protected speech because they retaliated against him. That conclusory assumption does not suffice. For a viable case, Wackett must prove defendants' knowledge of the protected speech to establish retaliation. All of the statements that Wackett claims the defendants resented were made while he was speaking in his official capacity. Even if he were to say similar things elsewhere in private, it would not alter the status of what he had already said in his official capacity. And in any event, the defendants presented evidence that the reason they did not appoint him as the Director was because they did not like his management style. That might be the nice way of saying what the facts in this case make clear—that the defendants did not particularly like Wackett. Only if that dislike stemmed from Wackett's

protected speech, though, would it be actionable, and Wackett bore the burden to present sufficient evidence to support that conclusion. But Wackett did not present any evidence that the defendants knew that he had spoken to members of the public outside his role as a Public Works employee. Therefore, even if Wackett's speech at some point were protected, it could not have caused the defendants to retaliate against him. *See Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 925 (7th Cir. 2007) (holding that the defendants were entitled to summary judgment on the plaintiff's First Amendment retaliation claim where there was no evidence the defendants knew of the plaintiff's speech because the plaintiff "offered insufficient evidence to prove a causal connection between his speech and termination").[1] Accordingly, the defendants were entitled to summary judgment on Wackett's First Amendment claim.

---

[1] The district court recognized as an additional basis for summary judgment Wackett's non-compliance with Local Rule 56.2(e), which provides that "the Court must conclude that there is no genuine material issue as to any proposed finding of fact to which no response is set out." In this case, the defendants proposed as a finding of fact that none of the individual defendants "knew that Wackett made any statements about them outside of public meetings regarding their votes to recommend that the City purchase a Caterpillar front end loader in 2003 until this lawsuit was filed." Wackett did not contest this proposed finding, and thus under Local Rule 56.2(e) that proposed finding of fact would be deemed admitted. As the district court recognized, this alone is a basis for granting summary judgment on Wackett's First Amendment claim.

### III.

To prevail on his First Amendment retaliation claim, Wackett needed to establish that he engaged in protected speech, which caused the defendants to retaliate against him. Because Wackett cannot show that any of the defendants knew of his purportedly protected speech, he cannot establish causation. Accordingly, the defendants were entitled to summary judgment. We AFFIRM.