In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-2919

DAVID KRISTOFEK,

*Plaintiff-Appellant*,

*v.*

VILLAGE OF ORLAND HILLS, a municipal corporation,
and THOMAS SCULLY, individually and in his official
capacity,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11 CV 7455 — **Samuel Der-Yeghiayan**, *Judge.*

ARGUED DECEMBER 4, 2015 — DECIDED AUGUST 11, 2016

Before POSNER, FLAUM, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge.* While working as a part-time police officer for the Village of Orland Hills, David Kristofek cited and arrested a driver for several car-insurance-related infractions. Following a flurry of phone calls between the

driver's mother, several local politicians, and Thomas Scully, the Village's chief of police, the driver was released and the citations against him were voided. Several months later, Kristofek participated in a police training session that involved two hypothetical instances of official police misconduct. Based on these hypotheticals, Kristofek became concerned that official misconduct may have occurred involving the voided citations. After Kristofek shared this concern with two other officers and with the FBI, Scully fired him.

Kristofek sued Scully and the Village, and the district court granted their motion for summary judgment. On appeal, Kristofek claims that the district court erred in holding that his statements to his colleagues and the FBI about the voided citations were not protected under the First Amendment. We agree. Kristofek was speaking as a private citizen about a matter of public concern, and his interest in speaking outweighed Scully's interest in promoting efficiency within the department. Kristofek also claims that the district court erroneously held that the Village was not liable for Scully's actions under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). But the district court correctly rejected Kristofek's *Monell* claim, since Scully did not possess the requisite authority to unilaterally fire Kristofek or to set departmental firing policy. So we reverse the district court's judgment relating to Kristofek's First Amendment retaliation claim against Scully, but affirm it as to Kristofek's *Monell* claim against the Village.

## I.  BACKGROUND

### A.  Arrest and Citations

In September 2010, the Village of Orland Hills, Illinois (Village) hired Kristofek as a part-time probationary officer. At the time, Kristofek was also working part time as an officer for the police department in Lemont, Illinois. While working for the Village in November 2010, Kristofek ran the license plate of a car that was being driven by Alonzo Marshall (Alonzo), a young black man. Kristofek discovered that the car's registration was suspended due to a lack of insurance and initiated a traffic stop. (The legality of this stop is not at issue on appeal.) After Alonzo was unable to provide proof of insurance, he was cited for driving with suspended license plates and for failing to provide proof of insurance. He was placed under arrest by Kristofek and transported to a police station by two other officers—Joseph Johnston and Ross Ricobene.

Between the commencement of the traffic stop and the arrest, Alonzo called his mother, Carol Marshall (Carol). Carol was working as a bus driver in neighboring Rich Township, and had previously worked as a trustee in Matteson, Illinois (which is located within Rich Township). After Carol got off the phone with Alonzo, she called Timothy Bradford, a friend who was a trustee for Rich Township, and complained about Alonzo's arrest. This led to a series of phone calls between several area public officials.

Bradford called Village Mayor Kyle Hastings, who in turn called Village Police Chief Thomas Scully. Hastings gave Bradford's phone number to Scully, who then spoke with Bradford about Carol's complaints. After getting off the

phone with Bradford, Scully called Deputy Police Chief Michael Blaha and briefly discussed the arrest. (The parties dispute the content of the discussion.) After the call, Alonzo was released, the citations were voided, and a letter was sent to the County Clerk identifying the citations and advising that they had been voided. Scully argues that this was done to protect the officers and the Village from a potential lawsuit. Kristofek claims, however, that Blaha told him that the incident involving Alonzo was not Kristofek's fault and "was above and beyond you and me."

In February 2011, a handgun was discovered in the backseat of Kristofek's squad car after Kristofek had returned the car to the station and gone off-duty. Kristofek admitted that the gun was likely in the car when he returned it and offered to resign. But Scully refused to accept the offer, stating in an email, "DO NOT submit your resignation as I will not accept it … . You're a good police officer Dave and we will learn from this experience."

## B. Kristofek's Termination

In early April 2011, Kristofek participated in an online training session through the Lemont Police Department. The session included two Q&As instructing that official misconduct occurs if a supervisor allows an arrestee in police custody at a station to leave, confiscates the related paperwork, and declines to forward it to the County Clerk or the State's Attorney. Kristofek believed these hypotheticals to be similar to the incident involving Alonzo, and became concerned that official misconduct had occurred for which he could be punished. He consulted with an attorney and was advised to bring the matter to the FBI's attention. Kristofek also expressed his concerns to Johnston and Ricobene—the two of-

ficers who took Alonzo to the police station after he was arrested—and asked them to help him report the matter to outside law enforcement. After both officers rebuffed Kristofek's request, he contacted the FBI.

Ricobene informed Scully about Kristofek's remarks, prompting Scully to reach out to Johnston for corroboration. (The parties dispute whether Scully was informed that Kristofek had consulted with an attorney and that Kristofek believed the officers' knowledge of the voided citations might constitute official misconduct.) Scully then met with Village Administrator John Daly to discuss Kristofek's comments and to recommend that Kristofek be fired. Daly agreed with Scully's recommendation but first wanted him to meet with Kristofek and confirm the content of Kristofek's statements.

Scully asked Kristofek to meet him in his office. Kristofek described the online training scenarios he had viewed and said that they suggested official misconduct had occurred in connection with Alonzo's voided citations. Kristofek claims that he also told Scully that he had recently met with the FBI to discuss the incident. (The FBI and U.S. Attorney's Office later investigated the matter and decided not to take action.) After Kristofek declined Scully's offer to submit a resignation letter, Scully fired him. In the ensuing days, Scully prepared a "notice of termination" that stated Kristofek was being fired because he had "contacted several members of this agency, telling them that the Chief of Police was a criminal and was going to be indicted," and had "accused the Village of being corrupt." The February handgun incident was not referenced.

### C. Legal Proceedings

Kristofek sued Scully and the Village, alleging that his termination violated the First Amendment and Illinois state law. The district court dismissed Kristofek's First Amendment claim and remanded the remaining claims to state court. But we reversed, finding that Kristofek's complaint adequately pled that his speech related to a matter of public concern (notwithstanding his apparent self-interested motivation in avoiding potential punishment), and that Scully possessed enough authority over hiring and firing to state (albeit barely) a *Monell* claim. *See generally Kristofek v. Vill. of Orland Hills*, 712 F.3d 979 (7th Cir. 2013) ("*Kristofek I*").

On remand, the parties conducted discovery and filed cross motions for summary judgment. The district court granted the defendants' motion and denied Kristofek's motion. In doing so, the court rejected Kristofek's claim against Scully on several grounds: Kristofek had failed to speak on a matter of public concern; the police department's interests in promoting efficient and effective public service outweighed his interest in expressing his speech; his speech was made with a reckless disregard for the truth; and his speech did not cause his termination because Scully was not aware of his contact with the FBI when Scully fired him. The court also concluded that Scully was entitled to qualified immunity. In addition, the court rejected Kristofek's *Monell* claim against the Village on the grounds that Kristofek's constitutional rights had not been violated, and that he had failed to demonstrate that Scully had policymaking authority over firing. This appeal followed.

## II. ANALYSIS

We review the district court's grant of summary judgment de novo and construe all factual inferences in Kristofek's favor as "the party against whom the motion under consideration is made." *Hess v. Reg-Ellen Mach. Tool Corp.*, 423 F.3d 653, 658 (7th Cir. 2005) (citation omitted). Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 978 (7th Cir. 2014).

### A. District Court Improperly Rejected First Amendment Retaliation Claim Against Scully

In order to prove a First Amendment retaliation claim, a public employee must show: (1) his speech was constitutionally protected; (2) this speech was a cause of his employer's action; and (3) he suffered deprivation as a result. *Wackett v. City of Beaver Dam, Wis.*, 642 F.3d 578, 581 (7th Cir. 2011) (citation omitted). The parties do not dispute that Kristofek suffered an adverse employment action and instead focus on the first two factors. We conclude that the district court erred in finding in Scully's favor as to each factor on summary judgment.

#### 1. Kristofek's Speech Was Protected

"For a public employee's speech to be protected under the First Amendment, the employee must show that (1) he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) his interest in expressing that speech was not outweighed by the state's interests as an employer in promoting effective and efficient public service." *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir.

2013) (citation and internal quotation marks omitted). We consider each of these factors in turn.

### a. Speaking as Private Citizen

The Supreme Court has instructed that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). However, that speech does not lose protection simply because it "concerns" or is "acquired by virtue of [the citizen's] public employment." *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014). Rather, the speech itself must "ordinarily [fall] within the scope of the [plaintiff]'s duties." *Id.* To determine the scope of a public employee's official duties, we look not only to the applicable job description but also to unwritten responsibilities that the employee is expected to perform. *E.g.*, *Renkin v. Gregory*, 541 F.3d 769, 773–74 (7th Cir. 2008); *Vose v. Kliment*, 506 F.3d 565, 570–71 (7th Cir. 2007). In addition, we must be especially careful in concluding that employees have spoken pursuant to their official duties when the speech concerns allegations of public corruption. That's because:

> It would be antithetical to our jurisprudence to conclude that the very kind of speech necessary to prosecute corruption by public officials—speech by public employees regarding information learned through their employment—may never form the basis for a First Amendment retaliation claim. Such a rule would place public employees who witness corruption in an impossible position, torn be-

> tween the obligation to testify truthfully and the desire to avoid retaliation and keep their jobs.

*Lane*, 134 S. Ct. at 2380; *see also Waters v. Churchill*, 511 U.S. 661, 674, (1994) (plurality opinion) ("Government employees are often in the best position to know what ails the agencies for which they work.").

We find that Kristofek's statements to Johnston, Ricobene, and the FBI were not made pursuant to his official duties. According to Kristofek, his responsibilities as a part-time police officer involved traffic enforcement and placing calls for public service and officer back-up. The fact that Kristofek's statements bore some relation to the subject matter of his job is not dispositive. For the speech to lack constitutional protection, it must constitute "'government employees' work product' that has been 'commissioned or created' by the employer." *Chrzanowski v. Bianchi*, 725 F.3d 734, 738 (7th Cir. 2013) (quoting *Garcetti*, 547 U.S. at 422). Here, Scully points to no evidence demonstrating that Kristofek was *responsible* for pursuing or voiding citations, or for determining when and under what circumstances arrestees could be released. *Compare Renkin*, 541 F.3d at 773 (concluding that university professor who complained about university's proposed use of grant funds spoke as a public employee, since administering the grant "aided in the fulfillment of his acknowledged teaching and service responsibilities"), *with Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1123–24 (7th Cir. 2009) (concluding that officer's statements concerning police chief's proposed staffing reductions at a union meeting were made in his capacity as a union representative, not as a police officer).

Scully argues that Kristofek was "doing what was expected of him and what he was generally paid to do" when he shared his concerns about the voided citations with Johnston and Ricobene and with the FBI. In support, he cites General Order 2.10, which instructs officers who believe they have received "an unlawful, unjust, or improper order" to submit a written report to the police chief. But Scully does not claim that Kristofek received an order from Scully, Blaha, or anyone else to void the citations and release Alonzo. So Kristofek had no duty to report under General Order 2.10. *Compare Morales v. Jones*, 494 F.3d 590, 597–98 (7th Cir. 2007) (finding that police officers' statements to one another and to an assistant district attorney about their superiors' possible harboring of a fugitive were not made as private citizens, since the officers had a duty to apprise one another of information pertinent to ongoing investigations, and to work with district attorneys to present criminal charges), *with Chaklos v. Stevens*, 560 F.3d 705, 712 (7th Cir. 2009) (finding that public employees who complained about anti-competitive practices were speaking as private citizens, in part, because their complaints were not submitted to the state attorney general or chief procurement officer as directed by state statute). So Kristofek was speaking as a citizen to Johnston, Ricobene, and the FBI.

### b. Speaking About Matters of Public Concern

For speech to be constitutionally protected it must also involve a matter of "public concern." *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 83 (2004) (per curiam). "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news in-

terest; that is, a subject of general interest and of value and concern to the public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (citations and internal quotation marks omitted). When undertaking public-concern inquiries, we examine the "content, form, and context" of the statements at issue. *Craig v. Rich Twp. High Sch. Dist. 277*, 736 F.3d 1110, 1115–16 (7th Cir. 2013) (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)). While none of the three factors is dispositive, content is the most important. *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 377 (7th Cir. 2009).

The content of Kristofek's statements—that Alonzo's citations were voided and that he was released solely on account of political favoritism—clearly involves a matter of public concern. *See, e.g.*, *Miller v. Jones*, 444 F.3d 929, 936 (7th Cir. 2006) ("Our cases have consistently held that speech alleging government malfeasance addresses matters of public concern in its substance."); *cf. Garcetti*, 547 U.S. at 425 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance."). In addition, Kristofek's statements to Johnston and Ricobene that he was considering contacting outside law enforcement are also protected. *See Belk v. Town of Manaqua*, 858 F.2d 1258, 1262–63 (7th Cir. 1988) (concluding that municipal employee's threat to file a grievance revealing that two municipal positions were being unlawfully held by a single individual involved a matter of public concern); *cf. Kristofek I*, 712 F.3d at 984 ("Any reasonable person would understand that a report to the FBI could potentially result in widespread changes to police practices in Orland Hills.").

The form and context of Kristofek's statements also demonstrate that the statements touched upon a matter of

public concern. We "look at the point of the speech in question" and ask whether it was "the employee's point to bring wrongdoing to light" or to "raise other issues of public concern, because they are of public concern." *Kokkinis v. Ivkovich*, 185 F.3d 840, 844 (7th Cir 1999) (citation and internal quotation marks omitted). We have repeatedly observed that although "a statement born of pure personal interest does not constitute a public concern, a mere personal aspect of the speaker's motivation will not defeat the entire speech." *Miller*, 444 F.3d at 937; *cf. Marshall v. Porter Cnty. Plan Comm'n*, 32 F.3d 1215, 1219 (7th Cir. 1994) (observing that "[i]t is often the case that those who speak out are also involved in personal disputes with employers and other employees"). We previously held that Kristofek's complaint adequately pled that his speech involved a matter of public concern. *Kristofek I*, 712 F.3d at 984–86. But because that decision rested solely on the pleadings, we must revisit the issue in light of the record as a whole. *Gustafson v. Jones*, 290 F.3d 895, 907 (7th Cir. 2002) ("*Gustafson II*").

By reaching out first to Johnston and Ricobene, and then to the FBI, Kristofek "explicitly and formally sought to alert a greater audience of the possible harm at issue." *Miller*, 444 F.3d at 937 (finding protected speech where police officer complained about police chief's actions to several separate entities including civilian oversight board). The fact that Kristofek's pre-FBI statements were made privately and separately to two fellow officers, by itself, does not affect their protected status. As noted above, Kristofek informed them that he believed official misconduct may have occurred involving the voided citations and that he was considering reporting the matter to an outside law-enforcement agency. This "created a 'communicative element' putting the listen-

er[s] on notice that a matter of public concern [was] being raised." *Miller*, 444 F.3d at 936; *see also Spiegla v. Hull*, 371 F.3d 928, 937 (7th Cir. 2004) (holding that employee who initiated a private conversation with a superior about alleged misconduct involving other employees spoke about a matter of public concern, in part, because the employee "did not intend that the conversation would be kept confidential").

It does not matter that Kristofek was motivated, at least in part, by self-interest. It is undisputed that Kristofek was concerned about being punished somehow if the details surrounding the voided citations came to light. But as noted above, he did not merely express to Johnston and Ricobene his concerns about being punished. He also took clear steps to alert outside law enforcement that official misconduct may have occurred and encouraged others to do so. *See Kristofek I*, 712 F.3d at 986 ("[I]f an objective of the speech was also to bring about change with public ramifications extending beyond the personal, then the speech does involve a matter of public concern.").

Critically, the record does not suggest that a reporter, investigator, or anyone else was inquiring into the matter which might have alerted Kristofek that potential punishment was eminent. Moreover, Kristofek did not rush to alert others about his concerns immediately after the training session concluded; rather, approximately two weeks passed before he contacted the FBI, thus indicating that self-preservation was not the sole motivating force. *See Marshall*, 32 F.3d at 1219 (holding that employee's complaints about failure to perform required building inspections were constitutionally protected, since the employee's charges "were communicated as office concerns, not as concerns that affect-

ed only [plaintiff]"); *see also Kristofek I*, 712 F.3d at 986 (emphasizing the importance of "distinguish[ing] between the secret intent of the *speaker* and the objective of the *speech*").

### c. *Pickering* **Balancing Favors Kristofek**

In order for Kristofek's speech to be constitutionally protected, he must show that his interest, "as a citizen, in commenting upon matters of public concern" outweighs the police department's interest, "as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968). We consider the following factors in balancing an employee's free-speech interests against an employer's management interests:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000); *see also Graber v. Clarke*, 763 F.3d 888, 896 (7th Cir. 2014) (noting that the seven factors need not all be addressed in turn). With respect to the first two factors, the disruptive nature of an em-

ployee's speech is so important in the context of law enforcement that a government employer is allowed to consider both the actual *and* the potential disruptiveness. *Lalowski v. City of Des Plaines*, 789 F.3d 784, 791–92 (7th Cir. 2015) (quoting *Kokkinis*, 185 F.3d at 846) (internal quotation marks omitted). Nevertheless, when a public employee's speech has touched upon a matter of "strong public concern," the government employer typically must "offer particularly convincing reasons to suppress it." *Gustafson v. Jones*, 117 F.3d 1015, 1019 (7th Cir. 1997) ("*Gustafson I*").

Scully makes no reference to Kristofek's conversation with the FBI when discussing *Pickering* balancing, so we treat this issue as waived. While Scully focuses solely on Kristofek's statements to Ricobene and Johnston, he does not claim that these statements *actually* undermined department efficiency. Nor could he, since he testified in a deposition that he was unaware of "any concrete way that anything that David Kristofek said interfered with the actual operations of [Scully's] police department." Instead, Scully argues that the police department's interests trumped Kristofek's because Kristofek's statements "ha[d] the *potential* to undermine Scully's ability to maintain discipline and authority." We disagree.

For one, Scully makes no effort to explain precisely *how* Kristofek's statements were potentially disruptive. *See Gustafson II*, 290 F.3d at 910 ("First Amendment rights cannot be trampled based on hypothetical concerns that a governmental employer never expressed."). In addition, the record indicates that Kristofek's statements to Johnston and Ricobene were measured and succinct, and that Kristofek had no plans to speak with anyone else in the department or the

public. *Compare Graber*, 763 F.3d at 896 (finding that officer's interests outweighed police department's, in part, because his statements were "brief" and "calm" and because the other officers present "testified that [plaintiff] did not interfere with their staffing duties"), *with Kokkinis*, 185 F.3d at 846 (concluding that police department's interests outweighed officer's, where officer's televised statements "caused embarrassment to his superiors and co-workers, who "believed that his appearance cast a negative light on the department and made the department look like a 'bunch of clowns' in the eyes of the surrounding communities").

Scully contends, in conclusory fashion, that Kristofek's allegations were "baseless" and "unsubstantiated." But Kristofek need not "prove the truth of his speech in order to secure the protections of the First Amendment." *Gazarkiewicz v. Town of Kingsford Heights, Ind.*, 359 F.3d 933, 942 (7th Cir. 2004) (quoting *Chappel v. Montgomery Cnty. Fire Prot. Dist. No. 1*, 131 F.3d 564, 576 (6th Cir. 1997)). "Rather, speech of public importance only loses its First Amendment protection if the public employee knew it was false or made it in reckless disregard of the truth." *Id.*

Scully has failed to meet this high bar. He ignores the obvious similarities between the events surrounding the voided citations and the Q&A's from the online training session. He also ignores the fact that before Kristofek spoke with Johnston and Ricobene, Kristofek consulted with an attorney who suggested that he contact the FBI. To be sure, the FBI and U.S. Attorney's Office ultimately declined to take action after completing their investigation. However, the investigation report does not indicate that Kristofek's factual recitation to FBI officials was flawed, or that his concerns were

wholly lacking in merit. Moreover, while Johnston and Ricobene declined to assist Kristofek in reaching out to the FBI, there is no indication that they told Kristofek that his suspicions were based on misinformation or would cause problems within the department.

We recognize that a police department employee could pose a serious threat to department discipline and harmony if he openly and repetitively claimed that top-ranking department officials have been complicit in political corruption—particularly if such claims had little-to-no grounds for support. But this is not such a case. Kristofek's belief that official misconduct may have occurred within the highest ranks of the police department represented a matter of strong public concern, and one that was communicated discreetly to the FBI and to two coworkers who were involved with the matter. His interest in making this speech was paramount.

### 2. Factual Dispute Exists Regarding Causation

Although we find that Kristofek's speech was constitutionally protected, his retaliation claim cannot survive unless he can show that his First Amendment protected speech caused his termination. On appeal, Scully does not contend that the statements to Johnston and Ricobene were unrelated to his termination, so we treat this issue as waived. Instead, Scully argues that his communication with the FBI was not a cause of his termination. We find, however, that a genuine factual dispute precludes summary judgment in Scully's favor on what is admittedly a very close issue.

Parts of the record suggest that Kristofek's communication with the FBI did not play a role in his firing. Perhaps

most notably, Scully informed Kristofek in an inter-office memo that he was being terminated based on statements he had made to "several members of this agency." In addition, Scully testified that according to Johnston and Ricobene, Kristofek had not told them that he (Kristofek) had spoken with anyone outside the department, including attorneys, about the matter.

Other parts of the record, however, suggest that Kristofek's communication with the FBI was a motivating factor. For one, Scully may have known that Kristofek had consulted with an attorney, and that Kristofek was considering reaching out to an outside law-enforcement agency. In his depositions, Kristofek testified that he told both Johnston and Ricobene that they could be implicated in the purported official misconduct, and asked them if they would be willing to *report* anything they knew. He also testified that he told Ricobene that his brother-in-law had done work with the Attorney General's office, and that he might contact him.

This all is critical because it is undisputed that both Ricobene and Johnston informed Scully about the substance of their communications with Kristofek. Indeed, in an interoffice memo to Scully, Johnston noted that Kristofek said "he consulted with an attorney if he could get charged for any of the members of the police administration voiding a valid arrest," and that "it would not hurt to ask the ASA"—presumably an Assistant State's Attorney—about the issue. In addition, Kristofek claims that shortly before terminating him, Scully asked if he had contacted the FBI and that Kristofek responded that he had. So Scully's termination decision could have been based on a belief that Kristofek was either considering or had decided to contact the FBI. *Cf. Belk*,

858 F.2d at 1264 (reversing grant of summary judgment in government employer's favor when employee had alleged that she was fired in retaliation for threatening to file grievance, and remanding for determination as to whether threat was motivating factor in her termination).

In addition, other parts of the record suggest that Scully communicated his termination decision to Kristofek only after Kristofek referenced his FBI communications. Kristofek testified that Scully had asked him whether he had reported the issue with the FBI, that he had said yes, and that Scully fired him later in the meeting. (In his deposition, Scully could not recall whether he had asked Kristofek at their termination meeting if Kristofek had contacted any outside agencies such as the FBI.) Given the fact that Daly had agreed with Scully's termination recommendation subject to corroboration from Kristofek, a factfinder could conclude that Scully's final decision to fire Kristofek was based, at least in part, on the fact that Kristofek had actually contacted the FBI.

### 3. Scully Not Entitled to Qualified Immunity

Scully argues that even if he violated Kristofek's constitutional right to speak out about possible political corruption, he is nevertheless entitled to qualified immunity. "In determining qualified immunity at the summary judgment stage, the court asks two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 648 (7th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

We have "long recognized that an employer may not re-taliate against an employee for expressing his views about matters of public concern." *Gorman v. Robinson*, 977 F.2d 350, 355 (7th Cir. 1992). However, we typically conduct qualified-immunity inquiries by focusing on the "specific context in the case," rather than on a "broad general proposition." *McGreal v. Ostrov*, 368 F.3d 657, 683 (7th Cir. 2004). Never-theless, "general statements of the law are not inherently in-capable of giving fair and clear warning, and in [certain] in-stances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (citation omitted).

As discussed above, Kristofek has adequately demon-strated that Scully terminated him in retaliation for speaking out about potential political corruption involving senior offi-cials within the police department. In addition, it was clearly established at the time of Scully's actions that the First Amendment prohibited retaliating against a public employ-ee because he had spoken with colleagues and with the FBI about public corruption. *See, e.g.*, *Hobgood*, 731 F.3d at 648 (observing that it was clearly established that "the First Amendment prohibited … terminating a public employee because he had helped another employee pursue a lawsuit aimed at uncovering and proving public corruption"); *Valen-tino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 678 (7th Cir. 2009) ("Terminating a government employee for speaking out against corruption in her workplace is surely contrary to clearly mandated public policy (the intersection of the First Amendment and the public's right not to be defrauded by its government) … ."); *Spiegla*, 371 F.3d at 937 (holding that em-ployee who initiated a private conversation with a superior

about alleged misconduct involving other employees spoke on a matter of public concern); *Gorman*, 977 F.2d at 356 (holding that government officials were not entitled to qualified immunity on claim that employee was fired in retaliation for contacting FBI about crimes by other public employees). So Scully is not entitled to qualified immunity on Kristofek's First Amendment retaliation claim.

**B.  *Monell* Claim Against Village Fails**

Under *Monell*, a municipality like the Village may be liable under § 1983 for constitutional violations caused by "(1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with 'final policymaking authority.'" *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009). Only the third approach is at issue here.

An official with decisionmaking responsibilities on firing matters is not always a policymaker under *Monell*; the official must possess "*final* decisionmaking authority." *Valentino*, 575 F.3d at 675–76. And this authority must concern setting policy for hiring and firing, not merely the act of hiring or firing itself. *Kujawski v. Bd. of Comm'rs of Bartholomew Cnty.*, 183 F.3d 734, 739 (7th Cir. 1999). With an eye toward the applicable state statutes, rules, and regulations as well as the relevant customs and practices, we inquire into: "(1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) 'whether the policy decision purportedly made by the official is within the realm of the official's grant of authority.'" *Valentino*, 575 F.3d at 676 (quoting *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995)); *see also Vodak v. City of*

*Chi.*, 639 F.3d 738, 748 (7th Cir. 2011) (asking whether the decisionmaker "was at the apex of authority for the action in question" (citation and internal quotation marks omitted)).

Here, Scully lacked the requisite independent authority to fire officers. As a part-time Village police offer, Kristofek was subject to a one-year probationary period that was to end in September 2012—approximately five months after he was fired. *See* ORLAND HILLS, ILL., CODE § 35.019(A). Although Village Code permitted Scully to fire officers within this probationary period, the power to do so was subject to the Village Administrator's consent. *See id.* § 35.019(C) ("If at any time during the probationary period, the supervisor or department head, *with the concurrence of the Administrator*, determines that the service of the employee has been unsatisfactory, the employee may be separated from service without the right to appeal." (emphasis added)); *id.* § 35.019(D) ("During or at the end of the probationary period, the employee may be dismissed at any time by the department head *with the approval of the Village Administrator … ."* (emphasis added)).[1]

The decision to terminate Kristofek's employment was made in accordance with § 35.019. It is uncontested that Scully and Daly (the Village Administrator) met to discuss Kristofek shortly before he was terminated. Scully testified that he "recommended" that Kristofek be terminated, and that Daly agreed (assuming Kristofek subsequently confirmed his official-misconduct statements). Daly not only

---

[1] The Village Code occasionally uses "Administrator" in place of "Village Administration." Neither the Code itself nor the parties' briefs suggest that this difference is relevant.

confirmed this account, but also testified that he had "always" been advised about employee terminations before they occurred. In addition, shortly after he terminated Kristofek in person, Scully sent a memo to Daly confirming that the termination had occurred. Such an action appears to us unnecessary if Scully had actually had the final say. So Kristofek has failed to show that a genuine factual issue exists regarding Scully's ability to unilaterally fire police officers.

Kristofek argues that even if Scully needed Daly's approval to terminate Kristofek, Daly consented "with full knowledge Scully was terminating Kristofek for his speech regarding corruption." *Monell* liability, he claims, would attach on this basis alone. Kristofek may be referencing the "ratification" theory, under which a plaintiff "must allege that a municipal official with final policymaking authority approved the subordinate's decision *and the basis for it*." *Darchak*, 580 F.3d at 630 (quoting *Baskin v. City of Des Plaines*, 138 F.3d 701, 705 (7th Cir. 1998)) (internal quotation mark omitted). Even if we assume Daly believed that Kristofek should have been fired in retaliation for his speech, the ratification theory does not help Kristofek.

As a threshold matter, Kristofek does not state or even imply that Daly possessed final authority to set firing policy. So the ratification theory fails on that ground alone. Instead, Kristofek contends that Scully possessed this authority. But that claim lacks support under Illinois law. The Village police department's policies and procedures manual directs the police chief to "plan, organize, staff, direct, and control the personnel and resources of the Department." The references to "staff[ing]" and to "control[ling] the personnel," according to Kristofek, demonstrate that Scully possessed policy-

making authority regarding officer firing. But this overlooks the fact that the Village Board is tasked with approving the policies and procedures by which police officers were bound. ORLAND HILLS, ILL., CODE § 32.067 ("All personnel of the Village Police Department, both sworn and non-sworn, are bound by the rules and regulations, and policy and procedures manual as promulgated by the Police Department and *approved by the Village Board*." (emphasis added)). So, while Scully may have exercised authority over the *enforcement* of the policies and procedures the Village Board approved—particularly if they did not involve hiring and firing—he did not possess final authority over policy *creation*.

### III. CONCLUSION

The judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion. In addition, we will direct that the matter be reassigned to a different district judge pursuant to Circuit Rule 36.